**WEST VIRGINIA NORTHERN RAIL-
ROAD COMPANY**

v.

**The UNITED STATES.**

No. 277–63.

United States Court of Claims.
March 15, 1968.

Fred R. Tansill, Washington, D. C., attorney of record, for plaintiff.

W. Stephen McConnell, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant, Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

### PER CURIAM:

This case was referred to Trial Commissioner Mastin G. White with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on June 2, 1967. Exceptions to the commissioner's opinion, findings, and recommendation were filed by plaintiff and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court is in agreement with the opinion, findings, and recommendation of the commissioner, with a very slight modification, it hereby adopts the same as modified as the basis for its judgment in this case as hereinafter set forth. Therefore, plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF COMMISSIONER

### WHITE, Commissioner:

The plaintiff, a West Virginia Corporation, is endeavoring in this action to obtain a refund of a portion of the income tax which the plaintiff paid for the year 1958.

It is my opinion that the plaintiff is not entitled to recover.

The question which must be answered in the case is whether the Internal Revenue Service acted properly or erroneously in partially disallowing, and assessing a deficiency with respect to, a deduction which the plaintiff claimed in its 1958 income tax return as locomotive rental.[1]

For a proper understanding of the legal question that is before the court for determination, it is necessary to outline the background material in considerable detail.

The plaintiff was chartered in 1883. It owns and operates 11 miles of railroad (plus related facilities) running over hilly terrain in West Virginia between the towns of Kingwood, where the plaintiff's headquarters are located, and Tunnelton. The plaintiff's railroad is operated as a feeder road for the Baltimore & Ohio Railroad, and the connection between the two railroads is at Tunnelton.

The plaintiff is primarily a carrier of bituminous (or soft) coal. It carries the coal from mines located along its line to the connection with the B&O at Tunnelton. Such shipments comprise approximately 98 percent of the plaintiff's business.

The relations between the plaintiff and the B&O are governed by the provisions of an agreement that was first entered into between the two companies in 1911. This agreement has been revised from time to time, but no change of any significance with respect to the issues involved in this case was made in the agreement during the period of time that is pertinent to the present litigation.

The plaintiff's income is derived almost wholly from the payments that it receives from the B&O in connection with coal shipments which originate on the

---

1. Another issue, raised in count V of the petition and relating to locomotive over-haul, was subsequently abandoned by the plaintiff.

plaintiff's line and are turned over to the B&O at Tunnelton for further transportation. The plaintiff is entitled to a certain percentage of the through revenue on each such shipment, under the agreement referred to in the preceding paragraph. If the B&O is the final carrier and effects delivery of a particular shipment, the plaintiff is entitled to 17 percent of the through revenue. On the other hand, if a particular shipment, after being handled by the B&O, is transported by some other carrier or carriers before delivery is affected, the plaintiff's percentage of the through revenue ranges between 15 percent and 3 percent, depending on the circumstances.

The B&O effects a settlement with, and issues a check to, the plaintiff on a monthly basis. These steps are accomplished not earlier than the 19th and not later than the 25th of the next succeeding month. However, a settlement is not necessarily limited to the shipments that were transferred by the plaintiff to the B&O during the particular month involved in the settlement. Occasionally, a settlement will include a shipment or shipments transferred by the plaintiff to the B&O months, or even years, prior to the month involved in the settlement.

In 1945, all of the plaintiff's stock, consisting of 1,000 shares, was purchased for $100,000 by James Jenkins, Sr., and his four adult children, namely, James Jenkins, Jr., Mrs. Violet Oberhaus, Mrs. Rheta Leimbach, and Mrs. Marguerite Ross. (For the sake of convenience, these five individuals will usually be referred to hereafter in the opinion as "the Jenkins family.")

After the Jenkins family purchased the plaintiff's stock in 1945 and gained control of the plaintiff, they made J. D. Everly superintendent of the plaintiff's railroad. Mr. Everly had been employed by the plaintiff since 1942; and it was due principally to his efforts that the Jenkins family had become interested in the plaintiff.

In 1945, the plaintiff had four Baldwin steam locomotives. The oldest of these was about 37 years old, and the newest was about 27 years old. Mr. Everly convinced the Jenkins family, after they acquired the plaintiff's stock, that the plaintiff should dispose of the steam locomotives and that two new diesel locomotives should be acquired to replace them. Action to effectuate this recommendation was taken in 1946. Two identical switching locomotives were purchased by James Jenkins, Sr., at a cost of $89,500 apiece. Each was a 1200 horsepower, diesel, electrically operated locomotive. The ownership of one locomotive was placed in the names of James Jenkins, Jr., and Mrs. Leimbach, each of whom owned a one-half interest in the locomotive; and the ownership of the other locomotive was similarly placed in the names of Mrs. Oberhaus and Mrs. Ross.

On June 14, 1946, the plaintiff, as lessee, and the four Jenkins children, as lessors, entered into an agreement for the lease of the two diesel locomotives owned by the four Jenkins children, who were also stockholders of the plaintiff. The locomotive lease provided for the hiring of the two locomotives by the plaintiff from the owners for a term of 5 years at a rental rate of 7½ cents per net ton of freight hauled by the plaintiff over its right-of-way. Under this agreement, the rent for the locomotives was to be computed each month, and payment was to be made by the plaintiff to the owners of the locomotives on the 15th day of the following month. The plaintiff was to maintain the two locomotives in good condition, wear and tear excepted, at the plaintiff's expense. At the end of the lease term, the plaintiff was to deliver the locomotives to the owners in good condition, damage by the elements excepted.

Subsequently, the ownership of the two diesel locomotives was transferred to the Jenkins Equipment Company, a partnership composed of the Jenkins family.

In addition to owning the plaintiff's stock, the Jenkins family also owned approximately 25,000 acres of coal lands in West Virginia, located about 15 miles

from Kingwood. The Jenkins family, trading and doing business as Jenkins Coal & Land Company, a partnership, acquired these coal lands on or about January 9, 1946.

In 1950, Ralph R. Lewis (who will usually be referred to hereafter in the opinion as "Mr. Lewis"), a business man and entrepreneur, obtained from the Jenkins family an option to lease or purchase their coal lands in West Virginia. Mr. Lewis had been interested for many years in the development of oil and other natural resources, and he had been endeavoring since the end of World War II to locate a large area of "uncaptured" coal lands, with the idea of having a plant for the generation of electric power built on or near such lands, so that the power plant could utilize the coal as fuel. In connection with this project, Mr. Lewis had been negotiating with the Rural Electrification Administration, which was interested in constructing a power plant near cheap coal in West Virginia. As a result of those contracts, Mr. Lewis had learned of the approximately 25,000 acres of coal lands in West Virginia owned by the Jenkins family.

After obtaining the option referred to in the preceding paragraph, Mr. Lewis endeavored to obtain the financing that was necessary in order to consummate the deal for the acquisition of the coal lands from the Jenkins family. During the course of his endeavors, Mr. Lewis came in contact with Mr. Spencer, the president of the Spencer Chemical Company, who became interested in the option that Mr. Lewis had obtained for the leasing or purchase of the coal lands owned by the Jenkins family. When the Jenkins family learned that Mr. Spencer was interested in the proposal, they suggested to Mr. Lewis that he withdraw from the transaction and permit the Spencer Chemical Company to deal directly with the Jenkins family. Mr. Lewis was agreeable to this.

Negotiations ensued between the Jenkins family and the Spencer Chemical Company. During the course of the negotiations, it was suggested by the Jenkins family that the proposed transaction should include not only the sale or leasing of the coal lands owned by the Jenkins family, but also the sale of the stock owned by the Jenkins family in the plaintiff railroad.

The negotiations between the Jenkins family and the Spencer Chemical Company resulted in the granting of two options by the Jenkins family to the Preston Coal Company, a wholly owned subsidiary of the Spencer Chemical Company. The opinions were dated December 30, 1950.

One of the options mentioned in the preceding paragraph granted to the Preston Coal Company the right, exercisable on or before July 1, 1951, to purchase all of the plaintiff's outstanding stock for $500,000, payable $50,000 in cash and the balance in 15 annual installments. This agreement provided that, in the event of the exercise of the option, the optionee would agree to a 25-year extension of the locomotive lease previously referred to, at the existing rental rate of 7½ cents per ton of freight hauled by the plaintiff. However, the stock option agreement further provided that it could be exercised only if the Preston Coal Company also exercised the other option mentioned in the preceding paragraph and further described in the succeeding paragraph.

The second option which the Jenkins family granted to the Preston Coal Company on December 30, 1950 conferred on Preston the right to purchase the approximately 25,000 acres of coal lands owned by the Jenkins family at the price of $50 per acre; or, in the alternative, Preston could lease the coal lands at a royalty rate of 10 cents per ton of coal mined and sold, with a stated minimum royalty of $30,000 per year.

In consideration of Mr. Lewis' activities in bringing the parties together and in surrendering his prior option on the coal lands owned by the Jenkins family, the Preston Coal Company entered into a letter agreement with Mr. Lewis on January 19, 1951. In this agreement, Preston agreed to pay Mr. Lewis certain roy-

alties if it exercised the coal lands option, and to assign to Mr. Lewis a certain number of shares of the plaintiff's stock if Preston exercised the railroad option. Preston also agreed to assign to Mr. Lewis all of its rights under the two options obtained from the Jenkins family if it should decide not to exercise the options.

Subsequently, the Preston Coal Company decided not to exercise the options which it had obtained from the Jenkins family. On March 19, 1951, Preston assigned to Mr. Lewis its entire interest in those agreements.

In considering the matter of whether to exercise the options transferred to him by the Preston Coal Company, Mr. Lewis consulted Howard Eavenson, an outstanding coal engineer of Pittsburgh, Pennsylvania. Mr. Eavenson conducted an investigation and then made a report to Mr. Lewis. It was Mr. Eavenson's opinion, as reported to Mr. Lewis, that the coal lands owned by the Jenkins family constituted the largest "uncaptured" coal area in the East; that if an efficient and economical way could be devised to clean the coal from such lands, much of it would be of sufficiently high quality to be sold at favorable prices in the markets along the Eastern seaboard, while the less desirable coal could be sold locally to an electric-power generating plant which, it was understood, was going to be built near Kingwood at Albright, West Virginia, by the Monongahela Power Company; and that, if a feasible cleaning method could be developed, a very profitable operation for the plaintiff in connection with the hauling of the coal would be assured.

Mr. Lewis also investigated and familiarized himself with the layout and physical condition of the plaintiff's properties. At the time, the plaintiff's physical facilities included a right-of-way, ties, tracks, rails, fastening switches, crossing signs, an office, an old frame shop building, various buildings used in connection with the maintenance of the right-of-way, and pump houses. Mr. Lewis ascertained that while such properties were not in excellent condition, the plaintiff's superintendent, J. D. Everly, was a competent man who had in mind plans which, if he were permitted to carry them out, would improve the railroad.

Mr. Lewis realized that if he were to exercise the options, he would be required to pay $500,000 for the stock of the plaintiff. Mr. Lewis' financial condition at the time was extremely poor. A prior business venture had been unsussuful, and a judgment had been rendered against him, which had not been satisfied. However, the plaintiff at the time was hauling bituminous coal from 23 mines located along its route, such coal being used primarily by public utilities on the Eastern seaboard, and Mr. Lewis believed that there was a good possibility that the coal mining operations in the vicinity of the plaintiff's line would be very successful in the future, thereby making the plaintiff's railroad operations highly profitable. Also, Mr. Lewis had been informed that the plaintiff had an earned surplus and undistributed profit of almost $300,000 as of January 1, 1951, and that the plaintiff's gross earnings in 1951 would approximate $300,000. Since Mr. Lewis was highly optimistic about future revenues, he regarded the purchase price of $500,000 for the plaintiff's stock as a reasonable one.

Mr. Lewis notified the Jenkins family that he intended to exercise both of the options that had been transferred to him by the Preston Coal Company. Thereupon, negotiations were begun between Mr. Lewis and the Jenkins family. The Jenkins family (each of whom then owned 200 shares of the plaintiff's stock) were concerned over Mr. Lewis' poor financial condition, especially in relation to the portion of the railroad option agreement to the effect that, although the purchase price was payable over a 15-year period, with only a $50,000 down payment, the stock was to be turned over to Mr. Lewis immediately, without any additional security. Furthermore, although the railroad option called for installment payments, no promissory note for the unpaid balance was required. The

Jenkins family desired the execution by Mr. Lewis of a 15-year promissory note to secure the payment of the 15 annual installments. The Jenkins family also wished to prevent a distribution of the existing surplus while the purchase price remained unpaid. In addition, the Jenkins family desired, as further security for Mr. Lewis' indebtedness to them on the purchase of the plaintiff's stock, that the rental to be paid by the plaintiff for the two diesel locomotives be increased from 7½ cents to 12½ cents per freight ton hauled by the plaintiff, and that the term of the locomotive lease be fixed at 15 years (the same term as the Lewis note), without any right of cancellation by the plaintiff unless by purchase of the locomotives for $387,500.

With respect to the option for the purchase or leasing of the coal lands owned by the Jenkins family, the Jenkins family desired that this be changed so as to provide for the leasing of only 19,660.81 acres of such lands for a term of 15 years, but they were agreeable to reducing the minimum annual royalty from $30,000 to $20,000.

Mr. Lewis ultimately agreed to the revised terms desired by the Jenkins family, as summarized in the two immediately preceding paragraphs, upon the agreement of the Jenkins family that 5 cents out of the sum of 12½ cents per freight ton that was to be paid by the plaintiff under the locomotive rental agreement, as revised, would be credited by the Jenkins family to the payment of the installments due on the Lewis note (or, if the time should come when no such installment was due, the 5-cent factor would be credited to the payment of the $20,000 minimum annual royalty under Mr. Lewis' lease of the coal lands).

The settlement between Mr. Lewis and the Jenkins family, pursuant to the exercise by Mr. Lewis of the options, as revised, for the purchase of the plaintiff's stock and the leasing of the coal lands, was accomplished on September 24, 1951. Several documents were executed at that time to finalize the transaction. As Mr.

Lewis personally did not have the necessary funds with which to make the $50,000 down payment on the purchase of the plaintiff's stock and the other financial outlays involved in the transaction between Mr. Lewis and the Jenkins family, the Jenkins family finally agreed to lend Mr. Lewis $90,000, of which the sum of $50,000 was to be used for the down payment on the purchase of the plaintiff's stock, the sum of $20,000 was to be used to pay the minimum annual royalty for the first year under the coal lands lease, and the sum of $20,000 was to be used for expenses. The 15-year promissory note executed by Mr. Lewis covered this $90,000 loan from the Jenkins family, as well as the $450,000 representing the remainder due on the purchase price of the plaintiff's stock, so that the total amount of the promissory note was $540,000. The note stated that the 1,000 shares of the plaintiff's stock would be held as security by the Jenkins family for the payment of the note; and Mr. Lewis also executed an assignment of the stock to the Jenkins family, on the understanding that the assignment could be used in the event of a default by Mr. Lewis.

The settlement of September 24, 1951 not only included the execution of documents relating to the acquisition of the plaintiff's stock and the leasing of the coal lands by Mr. Lewis, but a new locomotive lease was also signed as part of the settlement. This new lease was for a term of 15 years, and it provided for the payment by the plaintiff of "rental" at the rate of 12½ cents per ton of freight hauled by the plaintiff. The "rental" payments were to be made on a monthly basis. As previously indicated, the sum of 5 cents out of the basic "rental" rate of 12½ cents per ton was to be credited to the payment of the installments due on Mr. Lewis' promissory note to the Jenkins family in the face amount of $540,000 (or to the payment of the minimum royalty of $20,000 per year under Mr. Lewis' lease of coal lands from the Jenkins family, if the time should come when the promissory note was fully paid).

Despite his poor financial condition, Mr. Lewis was not particularly concerned over the $500,000 purchase price for the plaintiff's stock or over the $540,000 note which he signed on September 24, 1951. Although his plans were highly speculative at the time, Mr. Lewis was very optimistic concerning future prospects. On the basis of Howard Eavenson's estimates concerning the quantity of coal along the plaintiff's right-of-way, the likelihood of a feasible plan being devised for the cleaning of the coal, and the prospect of a power plant being constructed at Albright to consume the less desirable coal, Mr. Lewis believed that at least 10 million tons of coal could be mined and hauled over the plaintiff's line during the next 15 years. With 5 cents for each of these tons being credited against the purchase price of the plaintiff's stock, it would thus be possible for Mr. Lewis ultimately to obtain the ownership of the plaintiff's stock without any personal cash outlay, provided the plaintiff could haul enough coal.

After September 24, 1951, Mr. Lewis and his group took over the direction and control of the plaintiff. Thereafter, they operated the plaintiff's railroad, retaining the services of J. D. Everly, who was promoted from superintendent to general manager. A number of steps were taken in the process of rehabilitating the physical facilities of the railroad. New rails aggregating 5 miles in length were purchased, rail fixtures were procured, 18,000 new crossties were acquired, improvements were made to existing shop buildings, and a new shop was built. Much work was done in grading the roadbed and straightening curves.

Mr. Lewis was able to interest J. R. Maust, of the Maust Coal Company, in the local situation; and that company came into the area and took over a coal mine located adjacent to the plaintiff's line. Under the guidance of Howard Eavenson, Mr. Maust was successful in perfecting a method of cleaning the coal. As a result, a very profitable operation was developed by the Maust Coal Company, which was able to sell the clean coal to utilities along the Eastern seaboard and to sell the coal of poorer quality to the local power plant that had been constructed at Albright by the Monongahela Power Company. The Maust operation was so profitable that several other coal companies followed a similar pattern by establishing coal cleaning plants along the plaintiff's line. This had a materially beneficial effect on the tonnage of coal shipped over the plaintiff's line, and the operation of the railroad became quite profitable. The increase in coal shipments likewise increased the amount of the locomotive "rental'" payments that had to be made by the plaintiff to the Jenkins family at the rate of 12½ cents per ton of freight hauled by the plaintiff.

For each month after September 24, 1951, down to and including the first 4 months of 1958, a statement of the number of tons of freight shipped over the plaintiff's railroad was prepared by the plaintiff and sent to the Jenkins family, showing the total amount of the locomotive "rental" due from the plaintiff for the particular month under the locomotive lease, as revised in 1951, at the rate of 12½ cents per ton of freight hauled by the plaintiff, and a division of the total amount into the portion that was attributable to the 7½-cent rate and the portion that was attributable to the 5-cent factor. The part of the statement dividing the total payment due for the particular month into its component parts, calculated on the basis of 7½ cents per ton and 5 cents per ton, was furnished to the Jenkins family so that they would know how much of the monthly payment was to be credited against Mr. Lewis' personal obligation to them. The total amount due for the month was equally divided among the Jenkins family, and five checks were issued to them by the plaintiff.

The portions of the monthly locomotive "rental" payments attributable to the 5-cent factor were credited by the Jenkins family against the installments due on the Lewis note, throughout the

period from September 24, 1951 through the first 4 months of 1958.

As stated earlier in the opinion, the ownership of the locomotives was vested in the Jenkins Equipment Company, a partnership composed of the Jenkins family. In preparing and filing partnership income tax returns for the pertinent years, the Jenkins Equipment Company apportioned the amounts of locomotive "rental" received from the plaintiff during the period from September 24, 1951 through the first 4 months of 1958, using for this purpose the figures shown on the monthly statements submitted by the plaintiff, and declared as gross income from locomotive rental the portions of the monthly payments from the plaintiff attributable to the rate of $7\frac{1}{2}$ cents per ton of freight hauled by the plaintiff. The remaining portions of the monthly payments, calculated on the basis of 5 cents per ton of freight hauled by the plaintiff, were treated as payments on Mr. Lewis' obligation to the Jenkins family and, therefore, were not reported as ordinary income by the Jenkins Equipment Company.

Mr. Lewis never personally made any payments to the Jenkins family on account of his obligation to them in the amount of $540,000. Mr. Lewis never expected to make any payments on his obligation to the Jenkins family, but, instead, he expected the plaintiff to satisfy this obligation by payment of the 5-cent factor in the guise of locomotive rental.

Because the payments to the Jenkins family from the plaintiff under the locomotive rental agreement, as revised in 1951, were aggregating more than $125,000 per year and were regarded by Mr. Lewis and the plaintiff as being too high, Mr. Lewis and the plaintiff desired to modify such agreement. The Jenkins family expressed their willingness to amend the existing locomotive lease, as they wanted to extend the period of time over which they would continue to receive income.

Negotiations along the line referred to in the preceding paragraph resulted in the execution on April 30, 1958 of a series of documents by the Jenkins family, Mr. Lewis and the plaintiff (see findings 40 and 41). One of these documents was a new locomotive lease, which became effective on May 1, 1958 and which provided that the plaintiff would pay to the Jenkins Equipment Company—i. e., the Jenkins family—each month the sum of $3,750 as locomotive "rental," for a period of 15 years commencing in May 1958. It will be noted that the 1958 version of the locomotive rental agreement altered the method of computing each monthly payment, from a per-freight-ton rate to a flat monthly fee of $3,750. Accordingly, beginning in May 1958, the plaintiff paid the sum of $3,750 per month as locomotive "rental." The monthly payments were divided equally among the Jenkins family, five checks being issued to them by the plaintiff each month.

After the revision of the locomotive rental agreement effective at the beginning of May 1958, the Jenkins Equipment Company continued, for income tax purposes, to apportion the monthly amounts received from the plaintiff under the 1958 version of the locomotive lease, and reported as ordinary income only 59 percent of the amounts so received. This percentage figure was arrived at by computing the unpaid balance of the Lewis note (after subtracting the credits based on the 5-cent factor under the 1951 version of the locomotive rental agreement) to be $277,308.19 at the end of April 1958, and the value of the 1958 version of the locomotive lease to be $675,000 (12 x $3,750 x 15 years). By dividing the total amount to be paid under the 1958 version of the locomotive lease into the unpaid balance still due on the Lewis note, the result was 41 percent. Thus, 41 percent of each monthly payment received by the Jenkins Equipment Company (i. e., the Jenkins family) under the 1958 version of the locomotive lease was deemed by the Jenkins family to be a payment on Mr. Lewis' personal obligation to the Jenkins family, and 59 percent of each monthly payment was re-

garded as ordinary income from locomotive rental.

The plaintiff, on the other hand, at all relevant times deducted on its Federal income tax returns as locomotive rental the full amounts of the payments made by the plaintiff under the various versions of the locomotive lease.

## The Related Litigation

In a statutory notice of deficiency which was dated January 24, 1957 and which related to the years 1951, 1952, and 1953, the Internal Revenue Service disallowed the portions of the present plaintiff's deductions for locomotive rental which represented the 5-cent factor under the 1951 version of the locomotive lease. The present plaintiff contested this disallowance in the Tax Court. On October 28, 1959, the Tax Court rendered a decision on the question of whether the portions of the locomotive "rental" payments for 1951-1953 attributable to the 5-cent factor constituted deductible business expenses under Section 23(a) (1) (A) of the Internal Revenue Code of 1939, as amended (26 U.S.C. § 23(a) (1) (A) (1952)). That statutory provision stated (among other things) that in computing net income, "there shall be allowed as deductions * * * [a]11 the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *." The Tax Court answered the question before it in the negative, and held "that respondent [the Commissioner of Internal Revenue] properly disallowed the deduction by petitioner [the present plaintiff] of that portion of the annual payments made by it under the diesel leasing agreement as was represented by the 5-cent-per-freight-ton factor" (West Virginia Northern Railroad Co., 18 TCM 975, 979). The Tax Court's decision was affirmed by the Court of Appeals for the Fourth Circuit in West Virginia Northern Railroad Co. v. Commissioner of Internal Revenue, 282 F.2d 63 (1960); and the present plaintiff's petition for certiorari was denied by the Supreme Court, 366 U.S. 929, 81 S.Ct. 1650, 6 L.Ed.2d 388 (1961).

In a statutory notice of deficiency dated October 10, 1962, the Internal Revenue Service disallowed the portions of the present plaintiff's deductions for locomotive rental which represented the 5-cent factor for the years 1954-1957. Proceedings with respect to that notice of deficiency were instituted by the present plaintiff before the Tax Court, and such proceedings are still pending at the present time.

## The Claim for 1958

With respect to the year 1958, the Internal Revenue Service issued a deficiency notice based upon the disallowance of the portion of the 1958 deduction claimed by the plaintiff for locomotive rental which represented the 5-cent factor for the first 4 months of the year under the 1951 version of the locomotive lease, and 41 percent of the payments made by the plaintiff as locomotive rental for the last 8 months of 1958 at the rate of $3,750 per month under the 1958 version of the locomotive lease.

The plaintiff paid the deficiency assessed for the year 1958, and filed a timely claim for refund. Upon disallowance of the claim by the Internal Revenue Service, the plaintiff instituted the present litigation.

## The 5-Cent Factor

In view of the Tax Court's 1959 decision to the effect that the portions of the present plaintiff's locomotive "rental" payments for 1951-1953 which were attributable to the 5-cent factor under the 1951 version of the locomotive lease did not constitute deductible business expenses—a decision which the Court of Appeals for the Fourth Circuit affirmed and as to which the Supreme Court denied certiorari—the defendant contends in its brief that the plaintiff is precluded by the doctrine of collateral estoppel (or estoppel by judgment) from relitigating in the present action the issue as to the deductibility of the portions of the plaintiff's locomotive "rental" payments for

the first 4 months of 1958 which were attributable to the 5-cent factor under the 1951 version of the locomotive lease. The defendant relies principally on Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948), in presenting this argument.

With respect to the matter of collateral estoppel, perhaps it should be mentioned that the Tax Court's decision was based upon Section 23(a) (1) (A) of the Internal Revenue Code of 1939, as amended, and that, during the interval between the close of 1953 and the beginning of 1958, the 1939 Code was superseded by the Internal Revenue Code of 1954. However, the 1954 Code contains in Section 162(a) language virtually identical with that previously quoted from Section 23(a) (1) (A) of the 1939 Code.

In contending that the doctrine of collateral estoppel is applicable here, the defendant is tardily attempting in its brief to assert an affirmative defense. This matter should have been brought to the attention of the plaintiff and the court in the answer which the defendant filed on November 26, 1963. At that time, Rule 15(b) declared in mandatory language that "In pleading to a preceding pleading, a party *shall* set forth affirmatively * * * any * * * matter constituting an avoidance or affirmative defense" (emphasis supplied). A similar provision is now contained in Rule 19(b). Therefore, the defendant's attempt in its brief to assert the doctrine of collateral estoppel as an affirmative defense has been made too late in the proceedings.

It is interesting to observe that the petition in the present case does not allege that the portions of the plaintiff's locomotive "rental" payments for the first 4 months of 1958 which were attributable to the 5-cent factor constituted deductible business expenses. The plaintiff uses a different terminology for the purposes of the present litigation.

In the present case, the plaintiff primarily contends (in count I of the petition) that the payments which it made to the Jenkins family for the first 4 months of 1958 under the provisions of the 1951 locomotive lease constituted "a cost of operations," since the cost of renting the locomotives required for the hauling of shipments over its line was a cost of operating the railroad and, as such, should have been deducted from gross receipts in order to determine gross income, instead of being deducted from gross income in order to determine net income (as the plaintiff actually handled this item in its income tax return for 1958). However, the plaintiff does not explain clearly or convincingly just how "a cost of operations" differs from a business expense that is within the purview of Section 162(a) of the Internal Revenue Code of 1954 (successor to Section 23(a) (1) (A) of the 1939 Code).

A readily discernible fallacy underlying the plaintiff's novel contention is that the plaintiff begins with the assumption that the entire 12½ cents which the plaintiff paid to the Jenkins family on every ton of freight hauled over the plaintiff's line during the first 4 months of 1958 constituted remuneration to the Jenkins family for the use of their locomotives by the plaintiff in the operation of the railroad. As the Court of Appeals said in West Virginia Northern Railroad Co. v. Commissioner, supra, 282 F.2d at page 65, substance rather than form normally prevails in matters of taxation, and the taxability of a transaction is determined by its true nature. It is clear from the circumstances surrounding the formulation of the 1951 version of the locomotive lease that, in substance, the 1951 lease provided for the continued payment by the plaintiff of locomotive rental at the rate of 7½ cents per ton of freight hauled, and for the payment by the plaintiff to the Jenkins family of an additional sum of 5 cents per ton toward the discharge of Mr. Lewis' personal obligation to the Jenkins family under instruments other than the locomotive lease.

The plaintiff, for approximately 5 years prior to 1951, had been renting the two diesel locomotives from the Jenkins family at a rental rate of 7½ cents per

ton of freight hauled by the plaintiff. There is no evidence of any sort in the record tending to show a belief on the part of the Jenkins family that the rental rate of 7½ cents per ton provided insufficient compensation for the use of the locomotives. Rather, the evidence shows that the increase in the rental rate from 7½ cents to 12½ cents per ton was negotiated in 1951 because the Jenkins family desired additional security respecting the ultimate payment by Mr. Lewis of his indebtedness in the amount of $540,000 to the Jenkins family, based largely upon Mr. Lewis' purchase of the plaintiff's stock from the Jenkins family. It was clearly understood by all concerned that the sum of 5 cents out of every 12½ cents paid by the plaintiff to the Jenkins family under the 1951 locomotive lease was to be credited to the payment of the installments due on Mr. Lewis' promissory note to the Jenkins family in the face amount of $540,000 (or, if the time should ever come when no installment was due on the promissory note, the amounts attributable to the 5-cent factor were to be credited to the payment of the $20,000 minimum annual royalty due the Jenkins family under Mr. Lewis' lease of coal lands from them).

Thus, in substance, the 5-cent factor was never intended to be remuneration for the use by the plaintiff of the locomotives owned by the Jenkins family. For that reason, it would be wholly unrealistic to regard payments based upon the 5-cent factor as a cost of operating the railroad.

Instead, it is clear from the evidence that the provision for the payment of the 5-cent factor was inserted in the 1951 version of the locomotive lease as a means of providing for the discharge of Mr. Lewis' personal obligation to the Jenkins family. An expenditure by a taxpayer (the plaintiff here) to satisfy a personal obligation of a third person (Mr. Lewis) is certainly not a cost of operating the taxpayer's business. Therefore, irrespective of the soundness of the plaintiff's present contention that locomotive rental constituted "a cost of operations" deductible from gross receipts, rather than a business expense deductible from gross income, the fact remains, in so far as the 5-cent factor is concerned, that we are dealing here with payments which, in substance, did not constitute rental or compensation for the use of locomotives.

The same fallacy that has been discussed in connection with count I of the petition also underlies the alternative contentions made by the plaintiff in counts II and III of the petition.

In count II of the petition, the plaintiff alleges that the amounts paid to the Jenkins family under the 1951 version of the locomotive lease at the rate of 12½ cents per ton of freight hauled over the plaintiff's line represented a carved-out portion of the plaintiff's receipts retained as income by the Jenkins family when they disposed of their stock in the plaintiff to Mr. Lewis; and, accordingly, that the receipts of income from the plaintiff's settling agent, the Baltimore & Ohio Railroad, should be reduced pro rata to eliminate from gross receipts the factor of 12½ cents per ton.

In count III of the petition, the plaintiff says that the amounts disbursed to the Jenkins family under the 1951 locomotive lease were tantamount to capital investments in motive power, and, therefore, that the freight revenues subsequently received from the B&O were merely returns of capital or reimbursements of such amounts.

With respect to both of the alternative contentions made in counts II and III, the plaintiff ignores the fact that, in substance, the sum of 12½ cents per ton which the plaintiff paid to the Jenkins family under the 1951 locomotive lease on each ton of freight hauled over the plaintiff's line was made up of two separate elements—first, the sum of 7½ cents, which was intended to compensate the Jenkins family for the use of their locomotives as motive power for the hauling of freight over the plaintiff's line, and second, the sum of 5 cents, which was intended as a partial discharge of

Mr. Lewis' personal obligation to the Jenkins family under instruments other than the locomotive lease and which did not constitute, in any real sense, compensation for the use of the locomotives. We are not concerned in the present case with the segment of 7½ cents that constituted the true locomotive rental, but with the 5-cent factor, which, in substance, did not constitute any part of the true locomotive rental.

It must be concluded, therefore, that the plaintiff has not established any basis on which it could properly be found that the Internal Revenue Service erred in disallowing that portion of the 1958 deduction claimed by the plaintiff as locomotive rental which represented the 5-cent factor for the first 4 months of the year under the 1951 version of the locomotive lease.

*The 41-Percent Factor*

■ In auditing the plaintiff's income tax return for 1958, the Internal Revenue Service also disallowed the portion of the deduction claimed by the plaintiff as locomotive rental which represented 41 percent of the payments made by the plaintiff to the Jenkins family for the last 8 months of 1958 at the rate of $3,750 per month under the 1958 version of the locomotive lease. In count IV of the petition, the plaintiff asserts that the IRS committed error in this respect, since the plaintiff was no longer obligated, after the first 4 months of 1958, to make payments for the personal benefit of Mr. Lewis.

It is true that the new locomotive lease which became effective on May 1, 1958 provided for the payment by the plaintiff to the Jenkins family of a flat monthly fee of $3,750 as locomotive "rental"; that this instrument did not provide expressly for the crediting of any portion of the monthly sum to the payment of Mr. Lewis' personal obligation to the Jenkins family; and that, at the time when the new lease was signed, Mr. Lewis' promissory note to the Jenkins family in the face amount of $540,000 was endorsed by the Jenkins family,

"cancelled under a written agreement." However, when all the circumstances of the 1958 settlement are considered, it appears that, in substance, a portion of each monthly payment made by the plaintiff to the Jenkins family under the 1958 version of the locomotive lease should be regarded as a partial discharge of Mr. Lewis' personal obligation to the Jenkins family.

The negotiations that led up to the 1958 settlement were initiated because the payments to the Jenkins family from the plaintiff under the 1951 version of the locomotive lease were aggregating more than $125,000 per year and were regarded by Mr. Lewis and the plaintiff as being too high. The Jenkins family were willing to amend the 1951 locomotive lease, provided the new arrangement extended the period of time over which they would continue to receive income. As a result of the negotiations, a written agreement of settlement was executed by the Jenkins family, Mr. Lewis, and the plaintiff on April 30, 1958.

The settlement agreement of April 30, 1958 provided (among other things) that the 1951 locomotive lease between the Jenkins family and the plaintiff would be cancelled; that a new locomotive lease would be entered into effective May 1, 1958; that the plaintiff would agree to purchase the two locomotives for $40,000 on or before July 1, 1973, irrespective of the condition of the locomotives; that Mr. Lewis' promissory note in the face amount of $540,000 would be marked "cancelled and settled" and would be delivered, together with the 1,000 shares of the plaintiff's stock, to the First Pennsylvania Bank and Trust Company; and that the bank was to retain possession of the stock under a trust agreement and return the note to Mr. Lewis. The settlement agreement further provided that, upon the completion of all the conditions set out in the agreement, any and all claims arising out of Mr. Lewis' purchase of the plaintiff's stock would be "settled, ended and forever released."

A concurrent agreement between the Jenkins family and the First Pennsyl-

vania Banking and Trust Company provided that the bank would hold the 1,000 shares of the plaintiff's stock in trust to secure the performance by the plaintiff of its obligations under the settlement agreement referred to in the preceding paragraph.

It was pursuant to the settlement agreement of April 30, 1958 that the new locomotive lease was entered into, providing for the payment by the plaintiff to the Jenkins family of the sum of $3,750 each month as locomotive "rental" for a period of 15 years commencing in May 1958, and Mr. Lewis' note in the face amount of $540,000 was endorsed, "cancelled under a written agreement."

Thus, it will be seen that the settlement agreement of April 30, 1958 did not terminate Mr. Lewis' personal obligation to the Jenkins family arising out of the purchase by Mr. Lewis of the plaintiff's stock from the Jenkins family. Instead, such obligation was to remain in effect and the 1,000 shares of the plaintiff's stock were to be withheld from Mr. Lewis (or his assignee) until after the fulfillment of *all* the conditions established under the settlement agreement of April 30, 1958, including the payment by the plaintiff to the Jenkins family of $3,750 per month as locomotive "rental" for an additional period of 15 years. It was then—and only then—that the claims of the Jenkins family against Mr. Lewis were to be "settled, ended and forever released." Therefore, the conclusion seems inescapable that at least part of each monthly payment under the 1958 version of the locomotive lease was, in substance, intended as a partial satisfaction of Mr. Lewis' personal obligation to the Jenkins family in connection with the purchase of the plaintiff's stock.

In determining the portion of the locomotive "rental" payments for the last 8 months of 1958 that represented a partial discharge of Mr. Lewis' personal obligation to the Jenkins family, the Internal Revenue Service compared the balance due on the Lewis note at the end of April 1958 with the total amount payable by the plaintiff under the new locomotive lease that became effective on May 1, 1958, and concluded that 41 percent of the monthly payments under the 1958 locomotive lease represented sums paid by the plaintiff in partial satisfaction of Mr. Lewis' personal obligation to the Jenkins family. This allocation seems reasonable.

In any event, the plaintiff, which has the burden of proof in the present suit for a tax refund, has failed to show that the allocation by the IRS was unreasonable.