Ralph R. Lewis and Dorothea G. Lewis, et al., [1] v. Commissioner. Lewis v. Commissioner
Docket Nos. 4449-62, 158-63, 3537-65.
United States Tax Court
T.C. Memo 1968-56; 1968 Tax Ct. Memo LEXIS 241; 27 T.C.M. (CCH) 292; T.C.M. (RIA) 68056; April 4, 1968. Filed *241 Petitioner, Ralph R. Lewis, entered into agreements with the Jenkins family to purchase all of the stock of West Virginia Northern Railroad Co. for $500,000, payable over a period of years, with the Railroad stock to be collateral security for payment of the note evidencing the purchase price. Concurrent therewith Railroad entered into an agreement with the Jenkins family modifying a lease of two diesel locomotives by Railroad from the Jenkins family under which the "rental" was increased from 7 1/2 cents per ton of coal hauled to 12 1/2 cents per ton, with the additional 5 cents to be applied on Lewis' note to the Jenkins family. Held, the additional 5 cents per ton paid by Railroad to the Jenkins family was payment on the purchase price of Railroad's stock by Ralph Lewis and is neither deductible by Railroad nor excludable from Railroad's income for the years 1954-1957 under any of the theories advanced by petitioners. Held, further, the amounts attributable to the 5 cents per ton paid by Railroad to the Jenkins family, under both the agreements effective prior to April 30, 1958, and the modified agreements after April 30, 1958, are taxable as constructive dividends to petitioners *242 Lewis in the years 1951-1958. See West Virginia Northern Railroad Co. v. Commissioner [60-2 USTC 9702], 282 F. 2d 63, affirming a Memorandum Opinion of this Court [Dec. 23,819(M)] (involving the years 1951-1953); and West Virginia Northern Railroad Co. v. United States, - F. Supp. - (Mar. 15, 1968) (involving the year 1958 for Railroad). Fred R. Tansill and David E. Wasserstrom, 824 Connecticut Ave., Washington, D.C., for the petitioners. Max J. Hamburger, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in income tax relating to West Virginia Northern Railroad Co. in the following amounts: Year
Amount
1954
$14,225.00
1955
20,129.11
1956
20,567.51
1957
21,465.99
1958
21,672.24 The deficiencies for the years 1954-1957 are before this Court in docket No. 158-63. 293 The deficiency for the year 1958 is in issue before the U.S. Court of Claims. Respondent determined deficiencies in income tax relating to Ralph R. Lewis and Dorothea G. Lewis in the following amounts: Year
Amount
1951
$1,709.98
1952
6,265.64
1953
4,593.18
1954
3,552.38
1955
5,388.20
1956
7,557.88
1957
8,374.51
1958
4,249.27 The deficiencies determined for the years 1951-1957 *243 are before this Court in docket No. 4449-62. The deficiency for the year 1958 was paid and a suit for refund was filed with the U.S. Court of Claims. By amended answer in docket No. 4449-62, respondent asserted additional deficiencies in income tax relating to Ralph R. Lewis and Dorothea G. Lewis in the following amounts: Year
Additionaldeficiencies
1951
$ 2,905.86
1952
9,533.38
1953
7,114.18
1954
6,319.68
1955
10,559.42
1956
12,443.39
1957
13,702.45 In a second notice of deficiency respondent determined a deficiency in income tax relating to Ralph R. Lewis and Dorothea G. Lewis for the year 1958 in the amount of $228,031.94. The deficiency determined for the year 1958 is before this Court in docket No. 3537-65 as a result of a petition filed pursuant to section 7422(e), I.R.C. 1954. The only issue to be decided with respect to the West Virginia Northern Railroad Co. in docket No. 158-63 is whether respondent erred in disallowing a part of the deductions claimed on the corporation's tax returns as locomotive rentals [2] for the years 1954-1957. This same issue is before the Court of Claims for the corporation's taxable year 1958. This issue was decided in favor of respondent with respect to the years *244 1951-1953, in a Memorandum Opinion of this Court, West Virginia Northern Railroad Company, T.C. Memo. 1959-204, affd. 282 F. 2d 63, certiorari denied 366 U.S. 978. In this case petitioner concedes that the amounts involved are not deductible as locomotive rentals, but argues that they are either deductible as a cost of operations, or are excludable from petitioner's income as the nontaxable recovery of a capital investment in motive power, or as income carved out and retained by the lessors of the locomotives. All other adjustments by respondent with respect to the railroad company have been conceded. The issue to be decided with respect to Ralph R. Lewis and Dorothea G. Lewis for the years 1951 through 1958 is whether either of them realized constructive dividend income to the extent of all or 51 percent of the amounts which respondent disallowed as locomotive rental deductions by West Virginia Northern Railroad Co. As mentioned above and described hereinafter, this Court has previously sustained respondent's *245 disallowance of deductions claimed by the railroad company for the amounts charged to the Lewises as dividend income for the years 1951 through 1953, and the issue of the deductibility of the rentals by the railroad company for the year 1958 is before the U.S. Court of Claims. Respondent has made an alternative determination concerning the individual petitioners with respect to 1958 in which he takes the position that if certain agreements dated April 30, 1958, did not represent a mere continuation of prior arrangements, then the individuals realized income in 1958 as a result of the railroad company's assumption of a liability of Ralph R. Lewis in connection with those agreements. Findings of Fact Facts which the parties have stipulated orally and in writing and the exhibits attached to and incorporated by the written stipulations are incorporated herein by this reference. A summary of the facts necessary and relevant to determine the issues here involved, as gleaned from all the evidence, is as follows. Ralph R. and Dorothea G. Lewis (hereinafter referred to as Ralph and Dorothea or the Lewises) are husband and wife and resided in Philadelphia, Pa., during all of the years in issue *246 and at the time of the filing of their petitions in these cases. They filed joint Federal income tax returns for the years 1951 through 1958 with the district director of internal revenue at Philadelphia, Pa. 294 West Virginia Northern Railroad Co. (hereinafter referred to as Railroad) is a corporation originally chartered in 1883 and existing under the laws of the State of West Virginia. During the periods in question and at the time it filed its petition Railroad had its principal place of business at Kingwood, W. Va., and its executive offices in Philadelphia. Railroad filed its Federal corporate income tax returns for the years 1954 through 1957 on a calendar year, accrual basis of accounting with the district director of internal revenue at Parkersburg, W. Va. At all times here relevant and for a number of years prior to 1951, the business of Railroad consisted of owning and operating a coal-hauling railroad service over approximately 11 miles of track between Tunnelton and Kingwood, W. Va. Railroad's line was a feeder line which joined the Baltimore and Ohio Railroad (hereinafter referred to as B & O) at Tunnelton. Railroad carried only bituminous coal, and a small amount of *247 incidental freight. It owned no locomotives or rolling stock but did own, maintain, and operate the track and various small auxiliary facilities in the furtherance of this business. During all relevant periods the issued and outstanding stock of Railroad consisted of 1,000 shares. On February 14, 1945, all of Railroad's issued stock was purchased by various members of a Jenkins family for approximately $100,000. On December 30, 1950, Railroad's stock was owned in the manner shown below: Owner
Shares
James Jenkins, Sr
200
James Jenkins, Jr
200
Violet Oberhaus
200
Rheta Leimbach
200
Marguerite Ross 200
1,000 James Jenkins, Sr., was the father of the other shareholders named above. On June 14, 1946, the four Jenkins children named above were the joint owners of two diesel locomotives which they had purchased for approximately $90,000 each. These locomotives supplied Railroad's only motive power from 1946 through 1958. On June 14, 1946, the four Jenkins children leased the two locomotives to Railroad for a term of 5 years under a written lease agreement which provided for monthly rental payments computed at the rate of 7 1/2 cents per net ton of coal hauled on Railroad's tracks. On December 30, 1950, *248 the five members of the Jenkins family named above (hereinafter referred to as the Jenkins family) were also the owners of 25,000 acres of coal lands located in Preston County, W. Va., near Railroad's location but not adjacent thereto. Prior to 1950 Ralph Lewis became interested in acquiring coal properties or leases in Preston County, W. Va. He became convinced, partly through contacts with the U.S. Rural Electrification Administration, that if a power plant was constructed near such coal properties and a satisfactory method of cleaning the coal was developed, the production of coal in this area could become quite profitable. Railroad enjoyed a favorable railroad rate differential for shipment of the cleaned coal to the east, and if a power plant was constructed near the coal properties to buy the lower grade coal and produce electricity near the supply of coal, rather than ship the coal long distances to the power plants, it would be much more economical. In his search for such properties he became acquainted with Jenkins, Sr., who had both the coal property and the coal-hauling railroad. However, Ralph had no funds to develop his idea and he sought to interest outside financial *249 interests in the project. Through a contact with "Jock" Whitney, the Preston Coal Co. became interested in the Jenkins properties. On December 30, 1950, the Jenkins family granted options on their Railroad stock and the above-mentioned coal lands to Preston Coal Co. (hereinafter referred to as Preston). Both of the options were exercisable on or before July 1, 1951, and were assignable by Preston. The option on the coal lands provided that Preston could purchase the 25,000 acres owned by the Jenkins family for $50 an acre. In the alternative Preston could lease the coal properties at a royalty of 10 cents a ton for coal mined and sold, with a minimum annual royalty of $30,000 payable in advance. The option on the Railroad stock gave Preston the right to purchase the 1,000 shares owned by the Jenkins family for $500,000, provided that Preston exercised its option with respect to the coal lands. If Preston elected to exercise the stock option and if, among other things, there had been 295 "no adverse changes in the balance sheet of the Railroad," Preston agreed to pay $50,000 in cash and the balance of the purchase price in 15 annual installments of $30,000, together with interest at *250 the rate of 2 percent per annum. Preston and the Jenkins family agreed that if the stock option was exercised, the lease of the two diesel locomotives owned by the Jenkins children would be extended for a period of 25 years. At the end of the term of the extended lease, Railroad was to buy the locomotives for their fair market value at that time. On March 19, 1951, Preston assigned its rights in both the coal option and the stock option to Ralph Lewis. Prior to July 1, 1951, Ralph notified the Jenkins family of his intention to exercise both of the options acquired from Preston. After Ralph notified the Jenkins family of his intention to exercise the options, there was a period of negotiations during which Ralph was represented by Walter Biddle Saul (hereinafter referred to as Saul), a Philadelphia lawyer who had been Ralph's attorney on previous occasions. These negotiations arose out of the Jenkins family's concern that Ralph was not as strong financially as Preston, which had originally held the options in question, and that the Jenkins family was not afforded adequate security by the arrangements contemplated in the options. During the preliminary stages of these negotiations, *251 Ralph indicated to the Jenkins family that he did not have sufficient funds to make the initial payments for the stock and coal properties called for in the options. Ralph sought to raise the necessary funds, while the parties continued negotiations with respect to possible changes in the provisions of the option agreements. During the course of these negotiations, James Jenkins, Sr. (hereinafter referred to as Jenkins, Sr.), explained to Saul why he felt that the terms of the stock option failed to provide his family with adequate security. Although the purchase price was payable over a 15-year period with only a $50,000 downpayment, the stock itself was to be turned over to Ralph immediately with no additional security. Furthermore, the option did not require a note from Ralph for the unpaid balance of the purchase price. In addition, Jenkins, Sr., felt that there was nothing to prevent Ralph from distributing Railroad's surplus to himself once he gained control of the stock, even though the purchase price of the stock might not be fully paid. Saul was sympathetic to some of these fears, and agreed to certain changes in the option agreements. The only point on which there was a significant *252 dispute between the parties concerned the extension of the Railroad's lease of the two locomotives. Jenkins, Sr., requested that the rental be increased from 7 1/2 cents per ton to 12 1/2 cents per ton and that the lease be extended for a period of 15 years, rather than 25 years, during which time Railroad could cancel the lease only by buying the locomotives for $387,500. Saul was unwilling initially to agree to these changes because he felt that the increased rental charge would reduce the value of Railroad's stock and that the price to be paid for the stock by Ralph would have to be reduced by a corresponding amount. The Jenkins family replied that they desired the increased rental and would agree to a corresponding reduction in the purchase price of the stock. At a meeting held on September 24, 1951, the negotiations between the parties culminated in several agreements modifying and adding to the terms of the options held by Ralph. The relevant features of those agreements are described below. One of the agreements made on September 24, 1951 (hereinafter referred to as the general agreement), dealt generally with various aspects of the transactions between the Jenkins family and *253 Ralph. The option which Ralph held on the coal properties was modified in the following respects: (1) The option was limited to 19,660.81 acres rather than the 25,000 acres described in the original option; (2) the minimum royalty payable annually in advance was reduced from $30,000 to $20,000; and (3) the lease of the coal properties was to be for a minimum period of 15 years, during which period the lessee had a right to surrender acreage which proved to be unprofitable or as to which a marketable title was not provided but could otherwise terminate the lease only as provided in the collateral note as hereinafter described. The general agreement of September 24, 1951, also modified the stock option held by Ralph in the following respects: (1) The balance of the purchase price of the stock was to be evidenced and secured by a collateral note executed by Ralph for which the Railroad stock was to serve as collateral; (2) the Railroad's lease of the two locomotives would be modified to provide that Railroad would agree not to terminate the lease or use any other motive power so long as such arrangement was not prohibited by the 296 Interstate Commerce Commission; (3) Ralph agreed to *254 enter into a management agreement with William L. Sherman for the management of Railroad; (4) Jenkins, Sr., was given the right for a period of 10 years to name two members of Railroad's board of directors; (5) Ralph was to have the right to sell the Railroad stock being purchased, provided that at the completion of the sale the Jenkins family was paid the remaining balance of the collateral note; (6) if Ralph did sell his stock, the purchaser would have the right to cancel the locomotive lease by buying the locomotives for $387,500; (7) except for the immediate declaration of a $20,000 dividend to the Jenkins family, no dividends were to be declared out of Railroad's surplus accumulated prior to the settlement date, unless the dividends were paid to the Jenkins family to be credited against payments due on the note; (8) administrative salaries paid by Railroad were not to be increased beyond the level of those paid in December 1950, unless such increases could be paid from current earnings; and (9) as long as a balance remained due on the collateral note, the Railroad would not issue any bonds or debentures which were superior to the stock held as collateral for Ralph's note. The *255 Jenkins family agreed to lend Ralph $90,000, of which Ralph was to use $50,000 to make the downpayment on the stock, $20,000 to pay the advance royalty on the coal lease for the first year, and $20,000 in canceling his arrangements with certain bankers and paying his expenses. This $90,000 was to be included in the collateral note with the $450,000 balance of the purchase price of the stock so that the total amount of the note would be $540,000. The collateral note was to be payable in 15 annual installments of $34,666.66 and an installment payable 18 months after the execution of the note in the amount of $20,000. [3] *256 The note was to bear interest on unpaid installments at a rate of 2 percent annually. The note was to provide that if there was a default in the payment of principal and interest on the note or in the payment of advance royalties on the coal lease, then the Jenkins family could sell the stock held as collateral at a public sale or to themselves at a private sale. In the event that the collateral was sold, Ralph was to be released from any further liability under the note and would be entitled to cancel the lease of the coal properties. Another of the agreements between the Jenkins family and Ralph on September 24, 1951 (hereinafter referred to as the locomotive agreement), concerned Railroad's lease of the two diesel locomotives. After reciting, inter alia, that the Jenkins family, including Jenkins, Sr., were the owners of the locomotives, that agreement provided as follows: (1) The Railroad would enter into an extended lease agreement for a period of 15 years at a rental of 12 1/2 cents per ton of total aggregate freight hauled by Railroad; (2) Railroad was to pay the rental to the Jenkins family within 10 days after the receipt of checks from the B & O; (3) the rental was to be paid by checks mailed to such addresses as the Jenkins family should specify; (4) Railroad was to maintain the locomotives in good condition, ordinary wear and tear excepted, at its own cost; (5) Railroad was entitled to cancel the lease by buying the locomotives from the Jenkins family for $387,500; (6) Railroad was not to assign the lease or sublet the locomotives without prior written consent of the Jenkins *257 family; and (7) in the event Railroad defaulted on the lease, the Jenkins family was entitled to take immediate possession of the locomotives. The remaining agreement between the parties on September 24, 1951 (hereinafter referred to as the crediting agreement), concerned the disposition of the amount by which the locomotive rental was to be increased. That agreement contains the following provisions: The aggregate amount of five cents per ton out of the twelve and one-half cents per ton paid under the equipment contract shall be credited by Jenkins and his children as follows: a. To the payment of the installments due on the above recited note [$540,000 note] and the balance, if no installment be due, to the payment then due of the minimum royalties on the coal lands. b. Lewis agrees to forward to Jenkins copies of the monthly statements of freight as received from the Baltimore & Ohio Railroad. At the same meeting on September 24, 1951, which produced the agreements described above, a special meeting was held of Railroad's board of directors. The directors, initially consisting of members of the 297 Jenkins family, adopted the new locomotive lease providing for a rental of 12 1/2 *258 cents a ton. Inasmuch as the old locomotive lease had expired, the new lease was made retroactive to June 14, 1951, and the Jenkins family was paid $9,953.75 with respect to the 5-cent increase in the rental for the retroactive period. The minutes of the directors' meeting refer to the five members of the Jenkins family, including Jenkins, Sr., as the owners of the locomotives. While the members of the Jenkins family were still the directors of Railroad, they declared a dividend of $20,000 payable to themselves as the present owners of Railroad's stock. Thereafter, they resigned as Railroad's officers and directors. A new board of directors composed of two individuals designated by the Jenkins family and two designated by Lewis was elected. The newly elected directors ratified the agreements between the Jenkins family and Ralph in those respects affecting the Railroad. Saul was elected president of the corporation and William L. Sherman was elected treasurer and general manager. After the special meeting of Railroad's directors, settlement was held between the Jenkins family and Ralph. Jenkins, Sr., gave Ralph one check for $70,000, which Ralph endorsed and returned (representing the *259 $50,000 downpayment on the stock and the $20,000 advance royalties under the coal lease), and one check for $20,000, which Ralph kept to use in canceling his banking arrangements as previously described. Ralph executed the collateral note in the form described above. Ralph was given a certificate for Railroad's 1,000 shares of stock, which he handed to Charles B. Roberts, III, a representative of the Pennsylvania Company for Banking and Trusts (hereinafter referred to as First Pennsylvania). [4] *260 First Pennsylvania was represented at the meetings because of certain trust arrangements made by Ralph which are hereinafter described. Although the stock certificate was issued in the name of First Pennsylvania as trustee under a trust executed by Ralph, First Pennsylvania was not supposed to hold the stock itself, and sometime after September 24, 1951, the certificate was given to the Jenkins family to hold as security for Ralph's note. On September 24, 1951, Ralph transferred his interests in the Railroad stock, in the contract to purchase the stock and in the coal properties lease in trust to First Pennsylvania for the purpose of carrying out Ralph's agreements regarding the purchase of the stock, and his collateral note. The trust was for a term of 10 years. The following provision was contained in the written instrument executed by Ralph: It is understood and agreed that the Pennsylvania Company assumes no liability of any kind in acting as Trustee other than to exercise such rights as may be vested in it in accordance with the terms of the said agreement. At the expiration of the ten years, all of the trust property shall be reconveyed to the said Ralph R. Lewis, or his nominee. It is understood and agreed that it is only the equity in the stock of the Railway that is being transferred to the Trustee, the stock itself *261 being pledged as collateral to the vendors. On October 5, 1951, Ralph and First Pennsylvania entered into a Memorandum of Agreement which formalized the transfer in trust which Ralph had made on September 24, 1951. That agreement contained, among others, the following provisions: WHEREAS Ralph R. Lewis purchased from James Jenkins Sr. et al all of the outstanding stock of the West Virginia Northern Railroad Company, under an agreement dated the 24th day of September 1951, a copy of which is annexed hereto and made part hereof as Exhibit "A"; and WHEREAS it is the desire of Ralph R. Lewis to transfer the said stock to the Trustee, In Trust, for a period of ten years, for the purpose of assuring to the sellers of the said stock that the agreements contained in the said agreement of purchase shall be fulfilled on the part of the said Lewis; NOW THIS AGREEMENT WITNESSETH: 1. Ralph R. Lewis hereby transfers, sets over and assigns all his interest in and to the said 1000 shares of stock of the West Virginia Northern Railroad Company to the Trustee, In Trust, for a period of ten years, for the following uses and purposes: To hold the said stock for the benefit of the said Settlor, 298 Ralph *262 R. Lewis, his heirs and assigns, and to pay the said Settlor his heirs and assigns any profits which may accrue to the owners of the said stock, in accordance with the said agreement of sale attached hereto. [5] 2. The Trustee agrees (a) That immediately upon the said stock being delivered to it, registered in its name, it will deliver the stock to the sellers, under the collateral note referred to in the said agreement, together with Power of Attorney to transfer the said stock in event that there is default in any of the conditions contained in the said collateral note. (b) The Trustee agrees that as the registered holder of the stock of the said Railroad, it will cause the said stock to be voted at any stockholders' meeting, to carry out the terms of the said agreement of sale. 3. * * * The Trustee shall not be liable in any way for any of the debts or engagements of the said Settlor and assumes no liability of any kind in respect to the payments due under the said collateral note, and shall be liable only for its wilful neglect or negligence. * * * 5. This Trust shall terminate at the end of *263 ten years from the date of this agreement unless sooner terminated by a resale of the said stock by the said Lewis, complying with all the provisions of the said agreement of sale annexed hereto. 6. In the event of the termination of the Trust by a resale by Lewis or his assigns, the net proceeds of the sale shall be paid over to the said Lewis or his assigns. 7. At the end of ten years the Trustee shall reassign all interest in the corpus of the Trust upon the payment of its charges, to the said Lewis or his assignees. 8. The Settlor shall have the right to assign any or all of his interest in this Trust and the stock subject to the Trust, upon written assignment filed with the Trustee. Also on October 5, 1951, Ralph executed a written instrument containing the following language: [6]
KNOW ALL MEN BY THESE PRESENTS that I, RALPH R. LEWIS for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable considerations, receipt whereof is hereby acknowledged, do grant, bargain, sell, transfer and assign to DOROTHEA G. LEWIS, 100 shares of stock of the West Virginia Northern Railroad Company, a corporation of the State of West Virginia, which said stock is held by *264 * * * [First Pennsylvania], as Trustee for me, and I request * * * [First Pennsylvania] to file this assignment with the original Deed of Trust, it being understood and agreed by me as Assignor and by the Assignee, that the said stock is at present held as collateral for the payment of a certain collateral note referred to in the said Deed of Trust. The consideration received by Ralph from his wife for the assignment quoted above was the sum of $1,000 which Dorothea obtained from savings she had accumulated prior to their marriage. Ralph made the assignment of the stock to his wife on the advice of his attorney, Saul, in order that Ralph might divest himself of assets which could be reached by a judgment creditor. On January 21, 1936, a bank in Texas had obtained a judgment against Ralph in a Texas *265 court for $63,639.90 plus court costs of $910.35 and interest at 10 percent annually until the judgment was paid. That judgment had been purchased by Henry V. Slavik, of San Antonio, Texas, who continued to attempt to collect from Ralph until the judgment was satisfied in 1959. On October 19, 1951, Ralph executed an instrument which amended the Memorandum of Agreement dated October 5, 1951, by extending the term of the trust from 10 to 15 years to coincide with the term of Ralph's note to Jenkins. The amendment was acknowledged by Dorothea. as assignee of Ralph. On October 22, 1951, Dorothea assigned to various individuals stated percentages of "all distributions of property or cash made by * * * [First Pennsylvania], Trustee under a Deed of Trust executed by Ralph R. Lewis, bearing date the 5th day of October 1951." Each assignment executed by Dorothea contained the following provisions, which each of the respective assignees expressly acknowledged: 299 It is specifically understood and agreed by the assignee that this assignment is an assignment of a proportion of any distribution that may be made by the Trustee and does not vest in the assignee any right to direct or control any *266 action of the Trustee in connection with the stock of the West Virginia Northern Railroad Company, the subject of the Trust, or to interfere in any manner whatsoever in the affairs or management of the said Railroad, it being specifically understood and agreed that the Trustee, in any matter requiring direction or consent by the holders of the beneficial interests in the Trust, shall act at the direction of Ralph R. Lewis, Dorothea G. Lewis, Walter Biddle Saul and Hallowell V. Morgan, or the majority of them. The names of the individuals to whom Dorothea assigned the interests described above are shown in the following table, along with the consideration paid by each individual and the fractional interest in trust distributions which each individual received: Name
Consider- ation
Percentageinterest
Hallowell V. Morgan
$190
19
Hallowell V. Morgan
20
2
[7] *267 H. Russell Bishop 20
2
Maurice B. Saul
100
10
Walter B. Saul
100
10
Richard M. Saul
40
4
Isabel Reichert
10
1
A. Burke Summers 10
1
$490
49
On February 28, 1952, Dorothea executed a Memorandum of Agreement between herself and First Pennsylvania which contained; among others, the following provisions: 1. Dorothea G. Lewis, the Settlor, hereby sets over, transfers and assigns to * * * [First Pennsylvania], the Trustee, all of her interest of every kind and nature in a certain Deed of Trust executed by Ralph R. Lewis to * * * [First Pennsylvania], dated the 5th day of October 1951, which said interest consists of a 51% interest in the said trust, the other 49% interest having been assigned by her to other persons and the assignments lodged with the Trustee under the Trust, IN TRUST for the uses and purposes hereinafter set forth. 2. The Trustee agrees to hold the trust property in trust to pay the net income therefrom to Ralph R. Lewis and Dorothea G. Lewis, his wife, for their joint lives, and to the survivor. * * * 6. The Settlor shall have the right, upon payment of the proper charges of the Trustee, to revoke, alter or amend this Deed of Trust. 7. The Settlor may from time to time, with the consent of the Trustee, add to the corpus of the Trust. The trust agreement described above was sent to First Pennsylvania *268 by Dorothea with a letter dated April 8, 1952, which contained the following language: I herewith enclose a Declaration of Trust, executed by me, in connection with my interest in the Trust executed by my husband, Ralph R. Lewis. Under the terms of this proposed Trust I reserve the right to add to the Trust from time to time, additional assets. Will you therefore add to this proposed Trust whatever amount is due me under the Ralph R. Lewis Trust and invest the proceeds under the Trust in your discretionary trust fund, deducting the amount of your charges for accepting this Trust. Railroad declared and paid the following dividends during the taxable years 1952 to 1958, inclusive: Date
Per share
Total
Apr. 1, 1952
$ 5
$ 5,000
Sept. 10, 1952
15
15,000
Apr. 24, 1953
5
5,000 These dividends were all paid to First Pennsylvania, as trustee, pursuant to the trusts established by Ralph and Dorothea. After the execution of the various agreements on September 24, 1951, Ralph and his group took over direction and control of the railroad. Saul became president of the company and J. D. Everly became general superintendent and general manager. While Ralph did not become an officer of Railroad as such, he did *269 serve in a consulting capacity. Ralph's projections for the area bore fruit; a power plant was built near the railroad, a method for cleaning the coal was developed by J. R. Maust, a large coal operator along the railroad, and the coal tonnage shipped over the railroad increased considerably. Railroad, under Ralph's control, spent considerably more money for maintenance and repairs to make its operations more efficient than it had in the past. Rates for hauling freight originating on Railroad's line were established and supervised by the Interstate Commerce Commission. Railroad and the B&O had contractual 300 arrangements for division of revenues for hauling freight which originated on Railroad's line and was delivered to the B&O for further shipment toward its destination. The B&O usually collected the freight charges and accounted to Railroad for its share of the revenues on a monthly basis. However, there was often considerable delay from the time of shipment to the time Railroad received its revenues from those monthly shipments. Nevertheless, Railroad accounted to and paid the Jenkins family the tonnage rental provided in the locomotive agreement within 10 days after the close *270 of the month of shipment. Each month after September 24, 1951, a statement was prepared by Railroad and sent to the Jenkins family. That statement showed the number of tons of coal shipped over Railroad's lines during the previous month, the total amount of locomotive rental due the Jenkins family, and the portion of the locomotive rental in excess of the previous 7 1/2-cent rate. The total amount of locomotive rental due was paid by the issuance of individual checks payable to each of the five members of the Jenkins family in the amount of one-fifth of the total amount due. The following sums were paid or accrued by Railroad during the taxable years 1951 through 1958, inclusive, under the locomotive lease agreement dated September 24, 1951: Year
7 1/2 cents perton
5 cents per ton
Total "locomotiverental"
[1] *271 1951
$29,973.60
$19,982.40
$ 49,956.00
1952
54,612.21
36,407.54
91,019.75
1953
44,385.72
29,590.43
73,976.15
1954
44,800.20
29,866.80
74,667.00
1955
59,283.72
39,522.43
98,806.15
1956
76,767.00
[2] 51,178.00
127,945.00
1967
67,358.25
44,905.75
112,264.00
[3] 1958
17,066.10
11,377.40
28,443.50 During the period from October 1956 through February 1958, Railroad withheld $3,000 a month from the payments due the Jenkins family because of a controversy concerning who was responsible for the cost of overhauling the locomotives. The total amount so withheld was $51,000. Except for the $9,000 withheld for the last 3 months of 1956, Railroad claimed deductions *272 on its income tax returns for the total amount of locomotive rental payable at the 12 1/2-cent rate, whether paid or withheld. Although the total rental payable by Railroad at the 12 1/2-cent rate in 1956 was $127,945 as shown on the table above, Railroad deducted only $118,945 of that amount on its return. In the statutory notice to Railroad, respondent disallowed the entire $51,178 attributable to the 5-cent portion of the rental but increased the resulting amount by the $9,000 which had been withheld and not claimed as a deduction. The effect of respondent's adjustments in this regard was to allow a deduction of the $76,767 attributable to the 7 1/2-cent portion of the rental and to disallow only $42,178. In the agreements of April 30, 1958, which are hereinafter described, it was agreed that the Jenkins family would receive $29,000 with respect to the $51,000 which had been withheld by Railroad In the statutory notice to Railroad, respondent determined that Railroad realized income in 1958 in the amount of $22,000 as a result of the settlement concerning the $51,000. Railroad has not placed respondent's determinations for the year 1958 in issue before this Court. The amounts shown *273 above representing the 5-cent difference between the previous 7 1/2-cent rate and the new 12 1/2-cent rate were credited against the installments and interest due on the collateral note executed by Ralph in favor of the Jenkins family on September 24, 1951. Ralph did not personally make any payments on the note, nor was he ever in default with respect to any of the installment payments. At Saul's request Jenkins, Sr., made notations of the payments received on the reverse side of the collateral note. The notations by Jenkins, Sr., show payments of $34,666.67 on September 24 of each year from 1952 through 1956 and a payment of $20,000 on March 24, 1953. Other than the amounts attributable to the advance royalty of $20,000 for the first year, which was included in the total amount of the collateral note, none of the 301 locomotive rental payments was ever credited against the annual minimum royalty payable under the coal properties lease as provided in the crediting agreement of September 24, 1951. On July 3, 1952, Ralph assigned his interest in the coal properties lease to a man named Pier, who thereafter was directly liable to the Jenkins family for the royalty payments. Ralph retained *274 an overriding royalty of 2 1/2 cents on each ton of coal mined and sold by Pier. On February 20, 1954, there was filed with the clerk of Preston County a partnership agreement between the five members of the Jenkins family. That instrument was dated October 1, 1945, but was executed by each member of the Jenkins family in December 1953. The agreement between the Jenkins family contained, among others, the following provisions: (1) The said parties hereby agree that they became and have acted as partners in business since the 1st day of October, 1945, under an oral agreement which is hereinafter set forth for the purpose and upon the terms hereinafter stated. (2) The firm name of the partnership has been, is, and shall be Jenkins Equipment Company, with its principal office in Kingwood, West Virginia. (3) The business carried on by said partnership is as follows: (a) The ownership, operation, leasing and managing the business of operating railroad equipment including engines of each and every type for all purposes connected with railroading, * * * (6) The capital of said firm is the sum of * * * ($160,000.00), of which * * * ($80,000.00) was contributed by Rheta Leinbach [sic] and *275 James H. Jenkins, Jr., and used for the purpose of purchasing a certain GM diesel engine known as No. 50 and * * * ($80,000.00) has been contributed by Marguerite Jenkins Ross and Violet Jenkins Oberhaus and used for the purpose of acquiring a certain GM diesel engine known as Engine No. 51, and the said James H. Jenkins, Sr., has contributed his managerial abilities and made possible the commencement and existence of this partnership and it is agreed and understood that the five partners hereinabove named shall share equally in the profits and royalties of said partnership, each having a twenty per cent (20%) interest in said business. (7) * * * it is agreed and understood that the said James H. Jenkins, Sr., so long as he may remain a partner, be the Managing Partner, * * *. It appears that Jenkins Equipment Co. (hereinafter referred to as Jenkins Equipment) filed an information return for the year 1951 on which the four Jenkins children were shown as equal partners and ordinary income was shown as $71,395.72. [8] *276 The sale of the Jenkins family's railroad stock to Ralph was not reported originally by the Jenkins family. As revealed by several reports introduced into evidence, agents of the Internal Revenue Service determined in 1953 that an amount corresponding to the 5-cent portion of the rental paid by Railroad during 1951, or $19,982.40, should be eliminated from the receipts of Jenkins Equipment. It was also determined that the Jenkins family had realized a capital gain on the sale of the railroad stock in 1951. A rather complicated formula for computing this gain was agreed upon. So far as we can determine it was as follows. The $540,000 face amount of the note was attributable $500,000 (92.6 per cent) to the sale of the stock, $20,000 (3.7 percent) to advance coal royalties, and $20,000 (3.7 percent) to the loan to Ralph. However, it was determined that the $500,000 portion of the note attributable to the sale of the stock had a value on September 24, 1951, of only $160,000. Using a cost basis of $100,000 in the stock, it was determined that the Jenkins family realized a gain of $60,000 to be reported in 1951 on the sale of the stock. The remaining *277 $340,000, or 68 percent of the $500,000, was determined to be deferred profit. The 68 percent of the payments received in 1951 attributable to the sale of the stock (92.6 percent of the 5-cents-per-ton factor) was regarded as ordinary income and the balance of 32 percent was regarded as a return of capital. The Jenkins family agreed to this determination and for all years subsequent to 1951 through 1957, continued to report the 5-cent portion of the rental in the above manner. Robert Harvey (hereinafter referred to as Harvey) is presently employed as general manager of the Jenkins and McCaul Coal Co. of Frostburg, Md. Harvey has been associated with and employed by various 302 interests controlled by the Jenkins family since 1947. Harvey submitted a statement to the Jenkins family for each year through 1957 which showed the amounts received by each of the Jenkins family during the year in question which were attributable to the 5-cent portion of the locomotive rental which Railroad was paying the Jenkins family. On those statements 68 percent of the amounts attributable to the 5-cent portion of the rental was considered to constitute taxable income to the Jenkins family. For each of *278 the years 1953 through 1957, the information return filed by Jenkins Equipment reflected only the 7 1/2-cent portion of the receipts from Railroad, because that was the portion considered to be locomotive rentals. The amounts resulting from the 7 1/2-cent portion were divided into equal shares among the five members of the Jenkins family. The Jenkins children received their shares as owners of the locomotives and Jenkins, Sr., received his share as managing partner of Jenkins Equipment. The 5-cent portion of the rental payments was reported by the Jenkins family on their individual income tax returns as ordinary income and return of capital according to the allocation formula previously described. On January 24, 1957, a notice of deficiencies in Federal corporate income tax for the taxable years 1951, 1952, and 1953 was sent to Railroad. Among other adjustments to Railroad's reported income for those 3 years were disallowances of claimed locomotive rental expense in the amounts of $19,982.40, $36,407.94, and $29,590.43, respectively. The explanations for these disallowances were substantially identical for each of the 3 years; the explanation of the disallowance for 1951 is quoted *279 below: (d) It is determined that you are entitled to a deduction under the provisions of section 23(a) of the Internal Revenue Code of 1939 of $53,500.56 as rental expense for two diesel locomotives for the taxable year ended December 31, 1951. Therefore, the deduction of $73,482.96 claimed in your return as such expense is reduced by the excessive amount of $19,982.40. The said excessive amount of $19,982.40 represents payments made, or amounts to be paid, to the vendors of your capital stock, either as partial payment for such stock or as payment on a minimum royalty obligation of the vendee of your capital stock and it is determined further that you are not entitled under any provisions of the Internal Revenue Code to a deduction for such amount in computing your net income. Railroad filed a petition with the Court on April 19, 1957, which was assigned docket No. 66805. The only adjustments placed in issue by that petition were the disallowances of locomotive rentals. On October 28, 1959, Judge Tietjens of this Court filed a Memorandum Opinion in docket No. 66805 which was designated as T.C. Memo. 1959-204, which was affirmed on appeal as previously noted. In that opinion it was *280 determined that the amounts disallowed by respondent were not allowable rental deductions by Railroad. On April 1, 1958, the management of Railroad began to discuss the possibility of changing the locomotive leasing agreement with the Jenkins family. Among the factors involved in those discussions were disputes which had arisen between the parties as to who was responsible for paying State taxes on the locomotives and paying for the cost of major overhauls. As described previously herein, Railroad had withheld $51,000 as escrowed funds to pay for overhauls of the locomotives. Another factor in those discussions was Railroad's desire to reduce the rental being paid the Jenkins family annually which, due to the unexpectedly large tonnage being hauled, approximated $125,000 per year. Another factor was the desire on the part of Jenkins, Sr., to extend the term of the locomotive lease in order to provide greater security for his daughters. On or about April 30, 1958, the Jenkins family, Railroad, and Ralph entered into three agreements. These three agreements will be designated A,B, and C for purposes of describing them. Agreement A was a Memorandum of Lease dated April 30, 1958, between *281 the four Jenkins children trading as Jenkins Equipment Company and Jenkins, Sr., as manager of that company, parties of the first part, and Railroad, party of the second part. The Jenkins family leased the two diesel locomotives to Railroad for a term of 15 years commencing May 1, 1958, at a rental of $3,750 a month payable on the first day of each month beginning May 1, 1958. Among the terms of the leasing agreement were the following: The lessee shall pay all of the costs of keeping the said locomotives in repair and in good operating condition and no cost of any kind shall be chargeable to lessors. * * * The monthly rental shall be paid one-fifth to James Jenkins Sr. as Equipment 303 Company Manager so long as he shall remain as Equipment Company Manager, and the balance of the said rental, or all of the said rental if the said James Jenkins Sr. ceases to be the Equipment Company Manager, in equal shares to James Jenkins Jr., Violet A. Oberhaus, Rheta J. Leimbach and Marguerite E. Ross. Agreement B was an agreement whereby the four Jenkins children agreed to sell, and Railroad agreed to buy, the two diesel locomotives on July 1, 1973, for $20,000 each irrespective of the condition *282 of the said locomotives. Agreement C was a Memorandum of Settlement dated April 30, 1958, between the Jenkins family, Railroad, and Ralph. Along with recitals that prior agreements had been subject to different interpretations by the parties and that the parties desired to clarify their understanding and settle any differences that may have arisen, the Memorandum of Settlement contained the following provisions: 1. The existing agreement between the * * * [Railroad] and the Jenkins Family for the rental of two diesel locomotives shall be cancelled and all claims of every kind of either party thereto under the said existing agreement shall be cancelled forth-with and settled. 2. A new agreement for the rental of the said two diesel locomotives shall be executed by the parties in the form attached hereto * * * and the first rental payment under the said new agreement shall be made on the first day of May, 1958. 3. [Railroad] * * * will pay to * * * [the four Jenkins children], on the first day of each and every month beginning May 1, 1958, the sum of * * * ($1,000) until the full sum of * * * ($29,000) has been paid. 4. [Railroad] * * * will execute and deliver to * * * [the four Jenkins *283 children] an agreement agreeing to purchase the said two diesel locomotives, irrespective of their condition, or [sic] or before the 1st day of July, 1973, as set forth in the agreement attached hereto * * *. 5. The * * * Jenkins Family, shall mark the note of Ralph R. Lewis which they hold cancelled and settled and deliver the said note, together with the collateral of 1000 shares of the stock of the * * * [Railroad], to * * * [First Pennsylvania]; the stock to be held by * * * [First Pennsylvania] under a declaration of trust as set forth in the following paragraph, and upon the execution of the said declaration of trust, the note marked cancelled and settled shall be delivered by [First Pennsylvania] to the said Ralph R. Lewis. 6. [First Pennsylvania] * * * will execute, upon the receipt of the said stock, a declaration of trust in the form attached hereto * * *. 7. It is understood and agreed by the parties hereto that, upon the execution of the lease referred to in paragraph 2 hereof, the payments of the rental thereunder and on the delivery of the note of Ralph R. Lewis, marked cancelled and settled, and the delivery of the stock to [First Pennsylvania] * * * and the completion *284 of the payments under the terms of the said lease and the monthly payments totalling * * * ($29,000) as provided in paragraph 3 and upon the completion of the agreement of purchase referred to in paragraph 4, any and all claims of any kind and description by any of the parties hereto against any other party hereto, arising out of or in connection with the purchase of the stock of the * * * [Railroad] by Ralph R. Lewis have been settled, ended and forever released. Sometime in May 1958, First Pennsylvania executed the trust instrument referred to in Agreement C. Set forth below are pertinent provisions of that instrument. The designations of Exhibits A,B, and C correspond to the designations of Agreements A.B, and C used herein previously. [First Pennsylvania] * * * hereby acknowledges the receipt of One thousand (1,000) shares of the capital stock of the * * * [Railroad] registered in the name of Ralph R. Lewis and duly endorsed for transfer in blank by the said Ralph R. Lewis, which the said [First Pennsylvania] * * * as Trustee agrees to hold In Trust to secure the performance by the * * * [Railroad] of the following agreements, copies of which are attached and made part of this *285 Declaration of Trust as Exhibits "A," "B," and "C," in accordance with the following conditions: 1. If the said * * * [Railroad] for any reason whatsoever * * * defaults in the payment of the monthly rentals provided for in Exhibit "A" or of the monthly payments of * * * ($1,000.) per month beginning May 1, 1958, until a total of * * * ($29,000.) has been paid, as set forth in the settlement agreement attached hereto as Exhibit "C" or defaults in the performance of the purchase contract attached hereto as Exhibit "B" * * *, then the said Trustee shall deliver the said stock, duly endorsed, jointly to the said James Jenkins, Sr., James Jenkins, Jr., Violet A. Oberhaus, Rheta A. Leimbach Marguerite E. Ross, * * *. 304 2. In the event that the total payments are made under the terms of the rental agreement and the total payment of * * * ($29,000.) has been made as herein set forth and the agreement of purchase by the said Railroad of the said two diesel locomotives in 1973 is completed, then and in that event the said 1,000 shares of stock shall be delivered by the Trustee to * * * [First Pennsylvania], Trustee under Deed of Trust executed by Dorothea G. Lewis, dated February 28, 1952, *286 upon production of receipts or checks or evidence of payment of amounts for which the stock was held as security. Robert Harvey, whose association with the Jenkins family has been described previously participated in the negotiations between the parties which led to the locomotive rental agreement executed on April 30, 1958. The monthly rental figures discussed by the parties ranged from $2,700 to $4,000. Harvey recommended to the Jenkins family that the monthly rental should be $4,000. In making that recommendation, Harvey made a calculation that included (1) the balance which the Jenkins records showed remaining on Ralph's note as of April 1, 1958, in the amount of $277,308.19, (2) the projected rental income which would have been received from the 7 1/2-cent portion of the rent during the 7 1/2 years remaining on the lease dated September 24, 1951, and (3) the interest provisions of Ralph's note. Harvey also took into account the fact that the Jenkin's family would not bear the cost of any repairs under the new contract. Harvey discussed with Jenkins, Sr., the method to be used in reporting the rental income to be received under the locomotive leasing agreement dated April 30, 1958. *287 Since Jenkins, Sr., was of the opinion that there was actually no change other than an extension of the contract, Harvey continued to report the rental income after April 30, 1958, in essentially the same manner as had been used previously. Of the $30,000 received by the Jenkins family from Railroad during the last 8 months of 1958 under the rental agreement of April 30, 1958, Harvey treated $12,300 as payments on the note. The percentage used in computing the portion treated as payments on the note was derived from the relationship between 7 1/2 cents and 12 1/2 cents under the prior lease. As president of Railroad, Saul submitted a report dated September 15, 1958, to the Railroad's board of directors. Included in that report were the following comments: f. The Railroad has been engaged in a controversy with the Internal Revenue Department concerning the taxability for a portion of the rental paid to the Jenkins family for the use of the locomotives. This question is now before the Tax Court. In order to eliminate the question in the future, irrespective of the outcome of the tax litigation, the old contracts with the Jenkins family have been cancelled and a new contract made with *288 the owners of the locomotives, eliminating the controversial rental clause and substantially reducing the amount of the rental, which of course will result on a material reduction in the cost of operation. After the execution of the agreements of April 30, 1958, described above, the Jenkins family discovered the loss of the certificate for 1,000 shares of Railroad stock which had been issued in 1951 and had been held by the Jenkins family as collateral for Ralph's note. The Jenkins family requested Railroad to issue a substitute certificate in order that they could deliver the certificate to First Pennsylvania as required in the agreements described above. On October 8, 1958, Railroad issued a certificate for its 1,000 shares to First Pennsylvania as trustee under deed of trust dated May 1, 1958. First Pennsylvania continues to hold that certificate as trustee at the present time. Under the provisions of agreement C of April 30, 1958, described above, the Jenkins family was required to mark Ralph's note "cancelled and settled" and deliver the note to First Pennsylvania. In the course of complying with this requirement, the Jenkins family found that the original note executed by Ralph *289 in 1951 had been lost or misplaced. In order to complete the agreements the Jenkins family agreed to return the original note if it was found and provided a photostatic copy of the original note bearing the following notation: Frostburg, Maryland
July 31, 1958 This note has been cancelled under a written Agreement of Settlement between the holders of the note, Ralph R. Lewis, and West Virginia Northern Railroad Company, dated April 30, 1958. Signed: James Jenkins James Jenkins, Sr. Sometime after 1958 the original note which Ralph executed in 1951 was found and 305 returned to Ralph. After the note was returned, Saul made the following handwritten notation on the note: This note was cancelled by settlement agreement between the parties and cancellation endorsed on a photostat copy hereof due to the fact that this note was at the time mislaid by James Jenkins Sr. /s/W. B. Saul At some time not shown in the record, Ralph delivered a document to First Pennsylvania which contained the following language: On October 5, 1951 I delivered to you and you accepted a trust or escrow agreement under which you would hold 1,000 shares of stock of the West Virginia Northern Railroad Company. Later *290 I sold all of my rights in said stock to Dorothea G. Lewis and a new Deed of Trust was executed to you by her, in which this interest was included. Under the deed of October 5, 1951 you as Trustee were authorized to and did pledge the said stock of the West Virginia Northern Railroad Company to James Jenkins Sr. et al., as collateral for the payment of a note of Ralph R. Lewis in the sum of $540,000. This note has been cancelled and all claims of the said James Jenkins Sr. et al., in respect to the stock held as collateral to the said note were released and the said stock has been delivered to you under a Deed of Trust dated May 1, 1958 which Deed of Trust was approved and signed by all of the parties having any interest therein. In view of these facts, I now request a formal cancellation of the agreement of October 5, 1951 between the Pennsylvania Company for Banking and Trusts and myself. /s/ Ralph R. Lewis Jenkins, Sr., died on December 15, 1961. Among the assets shown on the Federal estate tax return for the estate of Jenkins, Sr., was the amount of $24,892.86, which was stated to be the value of the balance due from Lewis on the sale of 200 shares of Railroad stock. By notice *291 of deficiency mailed to the executor of the estate of Jenkins, Sr., on March 9, 1966, respondent determined that the value of the payments due Jenkins, Sr., from Lewis as of December 15, 1961, was $452,396.01. A petition for redetermination of the deficiency set forth in respondent's notice has been filed with this Court in docket No. 2453-66. The total amounts which respondent contends were realized as additional dividend income from Railroad by Ralph and Dorothea during the years involved in docket No. 4449-62 include amounts determined in the statutory notice and additional income alleged in an amended answer as shown below: Year
[1] Statutorynotice Addition inamended answer
Total
1951
$10,191.02
$ 9,791.38
$ 19,982.40
1952
18,568.05
17,839.89
36,407.94
1953
15,091.12
14,499.31
29,590.43
1954
15,232.07
14,634.73
29,866.80
1955
20,156.44
19,365.99
39,522.43
1956
21,510.78
20,667.22
[2] 42,178.00
1957
22,901.93
22,003.82
44,905.75
In *292 his motion to file the amended answer respondent asserted that the amounts of additional dividend income determined in the statutory notice represented 51 percent of the excess rental payments by Railroad and that the additional amounts alleged in the amended answer represented the remaining 49 percent of such payments. In the statutory notice involved in docket No. 3537-65, respondent determined that Ralph and Dorothea realized additional dividend income from Railroad in 1958 in the amount of $23,727.65, including $12,101.10 determined in the prior statutory notice with respect to which the deficiency had previously been assessed. Respondent also determined that the individual petitioners realized income in 1958 as a result of Railroad's assumption of Ralph' obligation in the amount of $273,818.60. In an amended answer in docket No. 3537-65 respondent alleged that the agreements of April 30, 1958, "represented a change in form only with respect to the prior locomotive rental agreement" and that the amount of additional dividend income for 1958 was $36,027.65, of which $23,727.65 [9] was attributable to the period prior to April 30, 1958, and $12,300 was attributable to the period after *293 April 30, 1958. On brief respondent concedes that the amounts shown in the amended answer were incorrect and contends that the additional dividend income for 1958 was $23,677.40, of which $11,377.40 was attributable to the period prior to April 306 30, and $12,300 was attributable to the period after April 30. The amount of $12,300 was attributed by respondent to the period after April 30, 1958, because that amount represents 41 percent of the total amount of rental paid during those 8 months at the rate of $3,750 a month. Respondent alleges in the alternative in his amended answer that if the agreements of April 30, 1958, represented new and binding arrangements, then Raph realized income as a result of Railroad's assumption of his liability in the amount of $273,818.60. The accumulated earnings and profits of Railroad as of December 31 of each of the years 1951 through 1958 were at least equal to the amounts which respondent has determined to be dividends to the individual petitioners for the respective years. *294 Railroad's earned surplus at the end of August 1951 was $297,431.57 and at the end of September 1951 was $302,100.88. In his statutory notice to Railroad respondent determined that the following amounts were not allowable locomotive rental deductions for the years indicated: [10]
Year
Amount
1954
$29,866.80
1955
39,522.43
1956
42,178.00
1957
44,905.75 As described previously, respondent does not allege that any greater amount should be disallowed for 1956, although the parties have stipulated that the amount attributable to the 5-cent portion of the rental for 1956 was $51,178. On March 2, 1965, respondent filed a motion in docket No. 158-63 for an order entering decision for respondent in the amount of the deficiencies determined with respect to *295 Railroad for the years 1954 through 1957 on the grounds that Railroad was collaterally estopped to relitigate the issue involved herein which was previously decided adversely to Railroad. A hearing on this motion was held before Judge Tietjens, then Chief Judge of this Court, on April 7, 1965, and briefs were filed by Railroad in opposition to the motion and by respondent in support of the motion. Respondent's motion was denied by Judge Tietjens by a Memorandum and Order dated December 13, 1965. Ultimate Findings of Fact The 5-cent-per-ton portion of the payments made by Railroad to the Jenkins family under the locomotive rental agreement of September 24, 1951, was payment on the purchase price of Railroad's stock which Ralph agreed to buy from the Jenkins family for $500,000. That portion of the rental payments made by Railroad to the Jenkins family attributable to the 5-cent factor is taxable to the Lewises in each of the years 1951 through 1958 as constructive dividends and such amounts are not deductible by Railroad for the years 1954 through 1957. The new agreements entered into by Railroad, the Lewises, and the Jenkins family on April 30, 1958, were a continuation of the arrangements *296 made in 1951 for purchase of Railroad's stock by Lewis and rental of the two locomotives by Railroad, both from the Jenkins family, in revised form and 41 percent of the monthly rental payments of $3,750 paid by Railroad to the Jenkins family in 1958, as provided for in the agreements of April 30, 1958, are attributable to the purchase price of Railroad's stock due from Ralph to the Jenkins family, and is taxable as constructive dividends to the Lewises in 1958. Opinion Respondent disallowed the portions of the locomotive rental deductions claimed by Railroad for the years 1954 through 1957 which represented the amounts attributable to the 5-cent portion of the rental which the Jenkins family was crediting against installments due on Ralph's note of September 24, 1951. Respondent's present position with respect to Ralph and Dorothea is that one or the other of them [11] realized constructive dividend income to the extent of the entire amounts attributable to the 5-cent portion of the rental which were paid by Railroad during the period from June 14, 1951 through April 30, 1958, and 41 percent of the rental of $3,750 a month paid during the last 8 months of 1958. Respondent has made an *297 alternative determination, which we construe to apply only to the 307 dividend amounts determined by respondent for the last 8 months of 1958, that if it should be determined that none of the rental payments made under the agreements of April 30, 1958, are taxable to the Lewises as constructive dividends that Ralph realized income during 1958 in the amount of $277,308.40 as a result of Railroad's assumption of the unpaid balance of the note dated September 24, 1951. It will be necessary to decide the correctness of this alternative determination only if we do not approve respondent's determination that the agreements of April 30, 1958, effected no substantive or substantial change in prior arrangements. Railroad argues that the true nature of the arrangements with the Jenkins family was such that either the 5-cent portion of the entire amount of the locomotive rental should be excluded from its gross income as income carved out and retained by the Jenkins family when they sold their stock, or that an equal amount of its receipts from the B&O should be excluded from its gross income as a return of a prior capital *298 investment in motive power; or that the entire rental paid should be deducted from its gross receipts as a cost of operations. Ralph and Dorothea contend that if either of these characterizations is accepted for purposes of determining Railroad's tax liability, it will be necessary to conclude that Railroad's payments to the Jenkins family did not constitute constructive dividends to the Lewises. Regardless of our determinations concerning Railroad, however, Ralph and Dorothea contend that there are other reasons why we should determine that they did not realize any constructive dividends as a result of Railroad's payments to the Jenkins family. With respect to payments made during the period from June 14, 1951, to April 30, 1958, the arguments made by the Lewises as to why they did not realize constructive dividends are: (1) That the payments were not made in satisfaction of Ralph's personal obligation; (2) That neither Ralph nor Dorothea owned the Railroad stock; and (3) That Railroad was in reality redeeming the Jenkins family's stock. With respect to 1958, the Lewises argue that the agreements of April 30, 1958, represented a novation which canceled Ralph's obligation for further *299 payments on the note and did not constitute a continuation of prior arrangements or an assumption by Railroad of Ralph's liability on the note dated September 24, 1951. Railroad's case - docket No. 158-63 As described in our findings, respondent filed a motion in docket No. 158-63 requesting an order entering decision in respondent's favor for the deficiencies determined with respect to Railroad for the years 1954 through 1957. Respondent contended in that motion that Railroad was collaterally estopped to argue that amounts attributable to the 5-cent portion of the payments to the Jenkins family were deductible under section 162(a) (3), I.R.C. 1954, because of our previous decision approving respondent's disallowance of corresponding amounts for the years 1951 through 1953. Although respondent's motion was denied by Judge Tietjens before this case was set for trial, respondent has renewed his collateral estoppel argument on brief. We find it unnecessary to pass on respondent's estoppel argument at this time because we have found that even upon reconsideration of the transactions in the light of petitioners' additional arguments and any additional evidence that was presented, the substance *300 of these transactions was that that portion of the "rental" payments resulting from the 5-cent factor made by Railroad to the Lewises was attributable to Ralph's obligation for the purchase price of Railroad's stock and is taxable to the Lewises and nondeductible by Railroad. Respondent's estoppel argument is based on the narrow view that the only issue concerning Railroad is whether the amounts in controversy are deductible under section 162(a)(3), I.R.C. 1954. Railroad does not contend that the amounts in question are deductible under that section and seems to concede, at least tacitly, that it is precluded by collateral estoppel from making such a contention. Judge Tietjens has ruled that the principle of collateral estoppel is not applicable because the issues raised by Railroad in this proceeding were not raised in the earlier proceeding. Even though we now believe that Railroad's arguments on these issues are more the advancement of theories rather than the raising of new issues, we have considered each of these arguments and find them to be without merit - so it is not necessary for us to reconsider Judge Tietjens' ruling. Railroad's principal argument is that part or all of *301 the amounts which it paid the Jenkins family as locomotive rental should be excluded from its gross income. Railroad argues that the locomotive rentals paid both before and after the sale of its stock to 308 Ralph actually represented income belonging to the Jenkins family and that Railroad did not hold that portion of its receipts under any claim of right but was merely an agent or conduit through which this income passed from the B&O to the Jenkins family. Railroad contends that the Jenkins family's beneficial control over these amounts is demonstrated conclusively by the number of restrictions placed on Railroad by the various agreements of September 24, 1951. Railroad makes what is apparently an alternative argument to the effect that the 5-cent portion of the rental was "designed and intended to pass on to the Jenkins family income of the Railroad which they had never surrendered." We cannot agree with Railroad that its gross income should be computed by excluding either the entire rental or the 5-cent portion from its gross receipts from the B&O. It is not necessary for us to decide whether amounts attributable to the 7 i/2-cent portion of the rental could be excluded from Railroad's *302 gross income because respondent has allowed statutory deductions from gross income for such amounts. We are concerned only with the 5-cent increase in the rental which was agreed upon in connection with the sale of Railroad's stock to Ralph. We have found nothing in the law or in the cases cited by Railroad which would require that the 5-cent portion of the rental be excluded from its gross income; or that would permit a deduction thereof from its gross income. We will first consider petitioners' arguments that all or a part of the rental paid by Railroad to the Jenkins family should be excluded from Railroad's gross income, and the principal cases cited in support thereof. [12] *303 As we understand these arguments they are that the payments were either income carved out and retained by the Jenkins family, presumably for use of the railroad facilities and the locomotives; or were a cost of Railroad's operations which should be excluded from gross receipts before arriving at gross income; or were a nontaxable recovery from gross receipts or a capital investment previously made by Railroad, presumably by payments to the Jenkins family, for motive power. In Pittsburgh Milk Co., 26 T.C. 707 (1956), the taxpayer was a milk dealer which had informal agreements with its customers whereby the taxpayer would be paid at the minimum prices established by the Milk Control Commission of Pennsylvania and then would return specified allowances to the customers. We held that the taxpayer's gross receipts should be reduced by the allowances in computing its gross income. In the present case, Railroad was not obligated to return any portion of its contractual percentage of freight revenue to the B&O. In Lela Sullenger, 11 T.C. 1076 (1948), respondent determined that the cost of goods sold to be used in computing the taxpayer's gross income from sales of meat should not include amounts paid for meat in excess of prices established by the Office of Price Administration. We held that the amounts in excess of the OPA price were actually a part of the cost of goods sold and should be reflected as such in the computation of the taxpayer's gross income. The difference between that case and *304 the present one is that the 5-cent portions of the payments to the Jenkins family were not actually a part of the locomotive rental or any other operating expense by Railroad. This distinction is even clearer with respect to Railroad's reliance on James P. McKenna, 1 B.T.A. 326 (1925), and Winkler v. United States, 230 F. 2d 766 (C.A. 1, 1956). In both of those cases it was decided that amounts paid to winning bettors must be eliminated from gross receipts in order to determine the gross income of bookmakers because losing bets was a necessary element of a bookmaking operation. There is nothing in this record to suggest that the Jenkins family would have insisted on the 5-cent increase in the rental if a sale to Ralph had not been contemplated. The only conclusion which we can reach on the evidence presented is that the increase was a necessary feature of the sale to Ralph and not of Railroad's operations. The critical aspect of Railroad's argument that amounts corresponding to the locomotive rental should be excluded from its gross income is the contention that the Jenkins family owned that portion of Railroad's income and that that ownership was not surrendered in connection with *305 the sale of stock to Ralph. In support of this argument Railroad cites Kirby Petroleum Co. v. 309 Commissioner, 326 U.S. 599 (1946); Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25 (1946); Commissioner v. J. S. Abercrombie Co., 162 F. 2d 338 (C.A. 5, 1947); and McCulley Ashlock, 18 T.C. 405 (1952). Although the first three cases cited are distinguishable on the ground that they dealt with concepts with peculiar applicability in the area of depletable natural resources, cf. Larry D. Hibler, 46 T.C. 663 (1966), affirmed per curiam 383 F. 2d 989 (C.A. 5, 1967), we think those cases and McCulley Ashlock, supra, are completely distinguishable on their facts. The Jenkins family never owned any of Railroad's income in any sense that would necessitate excluding such amounts from its gross receipts in computing its gross income. As we said in Larry D. Hibler, supra at 669: It is well established that income is taxed to the one who earns it or otherwise creates the right to receive it and to enjoy the benefits of it when paid. Prior to the sale to Ralph, the Jenkins family had a right as lessors to receive 7 i/2 cents for each ton of freight hauled by Railroad and a right as stockholders *306 to share in dividends distributed by Railroad. As shareholders, the Jenkins family had no direct interest in Railroad's income. Cf. Helvering v. O'Donnell, 303 U.S. 370 (1938). It has not been shown that the Jenkins family had any right enforceable against the B & O or that the B & O had the option - as Railroad now asserts without any supporting argument - to pay any portion of the freight revenue due the Railroad to the Jenkins family directly. Cf. Gray Processes Corporation, 43 B.T.A. 624 (1941), affirmed per curiam 122 F. 2d 1021 (C.A. 3, 1941). There is no evidence that if Railroad had become bankrupt, the Jenkins family would have had a claim on Railroad's assets superior to that of other creditors. Cf. Compton Bennett, 23 T.C. 1073 (1955). We doubt seriously that we could accept Railroad's argument even if we were faced with a sale of the locomotives to Railroad rather than a sale of stock to Ralph. Cf. Vermont Transit Co., 19 T.C. 1040 (1953), affd. 218 F. 2d 468 (C.A. 2, 1955), certiorari denied 349 U.S. 945 (1955). The important fact which distinguishes this case from the authorities cited by Railroad, however, is that there never was any transfer from the Jenkins family *307 to Railroad in connection with which the transferors could have retained any rights to income earned and received by Railroad after the transfer. The remaining aspect of Railroad's argument appears to be that it had no claim of right to a portion of its receipts from the B&O because it was required to pay that portion over to the Jenkins family. Railroad cites Lashells' Estate v. Commissioner, 208 F. 2d 430 (C. A. 6, 1953), affirming in part and reversing in part a Memorandum Opinion of this Court. In that case the partnership in question had never intended to claim any portion of the receipts from the subject transactions. Cf. United Draperies, Inc. v. Commissioner, 340 F. 2d 936, 938 (C.A. 7, 1964), affirming 41 T.C. 457 (1964), certiorari denied 382 U.S. 813. In the present case, Railroad received its freight revenue from the B&O under a claim of right against the B&O, and the fact that Railroad was obligated to pay a portion of that revenue to the Jenkins family has no effect on Railroad's gross income. Cf. United Draperies, Inc., 41 T.C. 457, affd. 340 F. 2d 936, certiorari denied 382 U.S. 813; Boyle, Flagg & Seaman, Inc; 25 T.C. 43 (1955). Railroad simply made a personal *308 covenant to pay the Jenkins family 12 i/2 cents per ton of coal hauled and did not make a legal or equitable assignment of any portion of its receipts. Cf. Gray Processes Corporation, supra. The 5-cent portion of the locomotive rental was the device used to pay the Jenkins family for their stock. Consequently, such amounts are not excludable from Railroad's gross income. Larry D. Hibler; Vermont Transit Co.; and Gray Processes Corporation, all supra. We are similarly unpersuaded that the Railroad's gross income should be computed by deducting the amounts paid as locomotive rental from its gross receipts on the theory that the locomotive rental was a cost of operations. Railroad argues that it was providing a service and that the locomotive rental was a cost of providing that service that should be treated in the same way as a cost of goods sold. As we have stated previously, the 5-cent portion of the rental which is in issue here was not necessitated by Railroad's operations but by the sale of stock to Ralph. Regardless of the extent to which amounts actually 310 paid as locomotive rental could or should be treated as a cost of operations, that treatment would not be appropriate *309 for amounts, such as those in question here, which were not paid as rental. Railroad has failed completely to show that the 5 cents per ton was paid for any service rendered by it which would qualify either as a cost of its operations or as an ordinary and necessary business expense. Railroad's argument that an amount equal to the rental payments should be excluded from gross receipts because it was a reimbursement of an investment in motive power appears to be based on the fact that Railroad was required to pay the Jenkins family the rental called for prior to the time Railroad was paid by B&O for its share of the freight revenues from the coal hauled upon which the rental was computed. Consequently, it is argued, Railroad was simply selling the service of moving coal by rail and fundamental to this activity was motive power; hence the money paid to the Jenkins family was to purchase motive power (which Railroad claims was a capital investment). While we have had some difficulty in following this argument, we nevertheless believe it is specious and lacking in substance or merit - and certainly cannot agree that this should permit exclusion from Railroad's gross receipts of any amount *310 for the tax-free recovery of these amounts. Railroad mentions a theory that in reality Railroad was simply redeeming its stock from the Jenkins family by these payments, but no explanation is advanced how this would affect Railroad's taxable income, even if we accepted the argument that this was the substance of the transactions, which we do not. Railroad has made no other arguments which would demonstrate that respondent's determinations with respect to Railroad were incorrect. Consequently, we approve those determinations for the same reasons we approved them with respect to the years 1951-1953 in West Virginia Northern Railroad Company, supra, our Memorandum Opinion issued in 1959. The Lewis cases - docket Nos. 4449-62 and 3537-65 Having rejected Railroad's arguments, we find it unnecessary to determine the effect our acceptance of either of those arguments would have had on the tax liabilities of Ralph and Dorothea. We turn now to the independent arguments which the Lewises have made in support of their contention that constructive dividends were not realized by them as a result of the payments of the 5-cent portion of the rental by Railroad to the Jenkins family. In respondent's *311 notice of deficiency in docket No. 4449-62 respondent determined that only 51 percent of the 5-cent portion of the rental payments made under the agreements of September 24, 1951, was taxable to the Lewises. By amended answer respondent has claimed that the entire amount of the 5-cent portion of the payments was taxable to the Lewises. This places the burden of proof with respect to the 51 percent on petitioners Lewis, and the burden of proof with respect to the 49 percent on respondent. However, we are convinced from all the evidence that the entire 5-cent portion of the rental payments was intended to be credited to and was attributable to Ralph's obligation on the $540,000 note covering the purchase price of the stock and the loan made to him by the Jenkins family, that no one else was obligated on the note and no one else benefited from these payments, and that Ralph and Dorothea at all times here involved retained a sufficient interest in Railroad's stock to support treating these payments as constructive dividends to them. The burden of proof thus becomes moot. Respondent contends that the amounts paid by Railroad which were credited by the Jenkins family against installments *312 due on the note executed by Ralph in 1951 represented taxable income in the nature of constructive dividends to Ralph and Dorothea. The basis for respondent's contention in this regard is that earnings of the corporation were being expended to satisfy its stockholders' personal obligation and that such expenditures constituted dividend distributions within the meaning of section 115(a), I.R.C. 1939, and section 316(a), I.R.C. 1954. Respondent cites the following cases in support of his position. Old Colony Trust Co. v. Commissioner, 279 U.S. 716 (1929); Wall v. United States, 164 F. 2d 462 (C.A. 4, 1947); Commissioner v. Makransky, 321 F. 2d 598 (C.A. 3, 1963), affirming 36 T.C. 446 (1961); American Properties, Inc; 28 T.C. 1100 (1957), affd. 262 F. 2d 150 (C.A. 9, 1958); Irving Sachs, 32 311 T.C. 815 (1959), affd. 277 F. 2d 879 (C.A. 8, 1960), certiorari denied 364 U.S. 833; Montgomery Engineering Co. v. United States, 344 F. 2d 996 (C.A. 3, 1965); Challenge Manufacturing Co., 37 T.C. 650 (1963). Ralph and Dorothea argue that the true substance of the transaction in question is not as respondent contends. They advance several arguments in support of their contention that neither *313 of them realized dividend income as a result of the payments by Railroad of the 5-cent portion of the locomotive rental. One argument made by the Lewises is that Railroad was actually redeeming the stock of the Jenkins family. We find nothing in the form or substance of the relevant transactions which would justify a determination that Railroad was acquiring the Jenkins family's stock. Railroad agreed to increase the amounts paid as locomotive rental from 7 i/2 cents a ton to 12 i/2 cents a ton. Railroad did not undertake to purchase or redeem any of its stock and redemption of its stock is not contemplated in any of the agreements. Railroad has paid dividends on that stock since 1951 and those dividends were paid to First Pennsylvania under the trust agreements executed by the Lewises. The Jenkins family agreed to apply the 5-cents per ton on the note Ralph gave them for purchasing the stock. The form of the transaction was a purchase of the Jenkins family's stock by Ralph. We consider that to have been its substance also. Another argument made by the Lewises is that Railroad's payment of the 5-cent portion of the rental was not a payment of Ralph's personal obligation. As we understand *314 this argument, it has two distinct aspects which are discussed separately below. One aspect of this argument is the contention that the parties to the sale of the stock actually agreed that the purchase price of the stock would be reduced by an amount corresponding to the amounts attributable to the 5-cent increase in the locomotive rental. The Lewises contend that the technique of crediting the 5-cent portion of the rental against the note was simply the method agreed upon for measuring the reduction in the purchase price of the stock. Without implying that the tax consequences would be different if we were to find that the parties to the sale had actually agreed on a reduction in the purchase price of the stock, we cannot agree that that was the substance of the transaction in question. If the 5-cent increase in the purported locomotive rental had actually been bargained for and agreed upon as locomotive rental, there might be some reason to conclude that there was a corresponding reduction in the purchase price of the stock. The Lewises do not contend in this proceeding, however, that the increase actually was locomotive rental, and both this Court and the Court of Appeals made *315 an unfavorable determination of that point in the opinions concerning the Railroad for the years 1951 through 1953. Even if the question were being presented to us for the first time, we would reach the same result. There are several factors which indicate persuasively that the 5-cent increase was not bargained for as rent but was a means of providing the Jenkins family with some security that the obligations assumed by Ralph would be satisfied. One such factor was the agreement that the 5-cent portion of the rental could be credited against advance royalties on the coal properties which Ralph leased from the Jenkins family, if there were no installments due on the note. Railroad had no interest in the coal properties and the value of its stock was in no way dependent upon them. The fact that the only royalties against which such credits were made were those included in the face amount of Ralph's note is irrelevant for purposes of our present inquiry, which is to determine the nature of the agreements actually made by the parties to the sale. We also think it is significant in this regard that no increase in the locomotive rental was provided in the option originally granted to Preston *316 and that the period for which the locomotive lease was to be extended was reduced from the 25 years provided in the original option to 15 years, which coincided with the term of Ralph's note. We have been requested by both respondent and the Lewises to look through the form of the transaction in question and determine its true substance. The substance of that transaction, as it appears to us, was that the Jenkins family demanded a minimum of $500,000 for their Railroad stock but agreed that the portion of that amount which Ralph had to pay personally could be reduced by the payments by Railroad which were attributable to the 5-cent increase in the locomotive rental. The effect 312 of the increase in the rental and the various restrictions concerning the locomotives and the management of Railroad was simply to provide the Jenkins family with a measure of security for the payment of the $500,000 purchase price for their stock which Ralph had agreed to pay. We find no discrepancy between the substance and the form of this transaction. The other aspect of the Lewises' argument that the payments in question were not made in satisfaction of Ralph's personal obligation is that Ralph's obligation *317 was actually that of a guarantor. The principle on which the Lewises rely is that payment by a corporation of its own obligation which is simply guaranteed by a stockholder does not give rise to dividend income to that stockholder. Arguing that all of the agreements of September 24, 1951, have to be construed together, the Lewises contend that Ralph's obligation was contingent, secondary, and indefinite. The essence of this argument is that Ralph was required to make payments on the note only if, after, and to the extent that the 5-cent portion of the rental was insufficient to satisfy an installment on the note which had become due. It is not necessary to examine this argument in greater detail to see that the Lewises have ignored the critical fact that Ralph, not the Railroad, had agreed to purchase the Jenkins family's stock. The obligation borne by the Railroad to make the rental payments was incurred as a means of satisfying the personal obligation incurred by Ralph to pay the Jenkins family $500,000 for their stock. Ralph became the owner of Railroad's stock by virtue of his execution of the note and the agreements of the parties. Railroad did not sign the note and had no obligation *318 with respect thereto. That the terms of the agreement tied the payment of the rentals to the use of the locomotives does not transform what is essentially a means of security for Ralph's payment of the purchase price into a primary obligation of Railroad of which Ralph was simply the guarantor. If there had been no agreement to increase the amount paid by Railroad as locomotive rental and Railroad had simply paid the amounts in question to the Jenkins family to be credited against the price Ralph had agreed to pay for the stock, the dividend nature of such amounts would be clear. Wall v. United States, supra; Robert Deutsch, 38 T.C. 118 (1962); Louis Zipp, 28 T.C. 314 (1957), affirmed per curiam 259 F. 2d 119 (C.A. 6, 1958), certiorari denied 359 U.S. 934; Ruphane B. Iverson, 29 B.T.A. 863 (1934). Since we have concluded that Railroad's obligation to pay the increased rental was incurred solely as a means of satisfying Ralph's obligations to the Jenkins family, the fact that the amounts in question were required by Railroad's obligation does not alter the fact that they were also made in satisfaction of Ralph's personal obligation. The cases cited by the Lewises in connection with *319 this argument are all distinguishable from the present situation. In Lloyd H. Diehl, 1 T.C. 139 (1942), affirmed per curiam 142 F. 2d 449 (C.A. 6, 1944), we found that the taxpayers realized no economic benefit as a result of the payments in question. In the present instance, we have found that Railroad's payments did produce such a benefit to Ralph. He became the owner of a railroad company. In Arthur J. Kobacker, 37 T.C. 882 (1962), we held that the taxpayers did not realize dividend income with respect to payments on an indebtedness assumed in connection with a merger by a corporation of which the taxpayers were the sole shareholders. The merged corporation had been formed by the taxpayers to acquire the stock of the surviving corporation with funds contributed by the taxpayers and borrowed funds which gave rise to the indebtedness in question. We found that the merged corporation was not a sham and that it, not the taxpayer, had purchased the surviving corporation's stock and incurred the indebtedness in question. In the present case, Ralph was the purchaser of Railroad's stock and the indebtedness was incurred by him. William H. Perry, 47 T.C. 159 (1966), on appeal (C.A. 8, *320 Feb. 17, 1967), involved the question of whether an indebtedness for which a shareholder was liable as a guarantor but had not paid constituted an indebtedness of the corporation to the shareholder for purposes of section 1374, I.R.C. 1954, and is not applicable to the present case. Because of the considerations discussed above, we conclude that the amounts in question were paid by Railroad to the Jenkins family in order to satisfy the personal obligation incurred by Ralph in connection with his purchase of the Railroad 313 stock from the Jenkins family. The general rule which we must follow in deciding this case is stated in the following excerpt from our decision in Irving Sachs, supra at 820: It is well settled that if a corporation pays an obligation of its stockholder or makes a payment for his benefit, the payment may constitute a taxable dividend to the stockholder. [Cits. omitted.] Unless there is some merit in the Lewises' remaining argument, we will be constrained to find that they realized dividend income with respect to the amounts in question. The remaining argument made by the Lewises in support of their contention that no dividend income was realized is that they were *321 not stockholders of Railroad during the period in question and that, consequently, it is improper to attribute any dividends to them. In making this argument the Lewises rely on the various transfers in trust which are described in our findings. Respondent meets this argument, in the first instance, by contending that it is the discharge of Ralph's legal obligation which produces taxable income regardless of the legal and equitable ownership of the Railroad stock. In any event, respondent maintains, Ralph's actual control and domination over the trust and the Railroad stock requires that he be treated as the owner of that stock for purposes of treating the amounts in question as dividends to him. We have concluded that the income arising from Railroad's payments of the 5-cent portion of the rental to the Jenkins family should be attributed to the Lewises. Leaving aside for the moment the questions raised by Ralph's alleged assignment of all of his interest in the trust to Dorothea, we have concluded that under the terms of the original trust created by Ralph the 5-cent portion of the rental payments would be attributable to Ralph. Under that trust agreement Railroad's stock was transferred *322 to the trust for the principal purpose of securing the payment of Ralph's obligation on the note. Upon satisfaction of that obligation the stock was to be returned to Ralph or his assignee. The stock certificate was issued in the name of First Pennsylvania, as trustee for Ralph, but was in fact delivered to the Jenkins family to hold until the obligation was paid. The transfer in trust was also apparently motivated by the desire to place this asset of Ralph's out of the reach of Ralph's creditors at least until his obligation to the Jenkins family was paid in full. Ralph was the beneficial owner of the stock throughout the period here involved. When the transactions of April 30, 1958, were entered into it was Ralph who entered into the new trust agreement and transfererd the stock to the trust for the same purposes. The trusts were not the recipients of any benefits derived from Railroad's payments of the additional 5 cents per ton to the Jenkins family. The trusts were not obligated on the indebtedness to which the payments were applied, nor were the income beneficiaries, as such, obligated thereon. This is true with respect to the 41 percent of the payments made after April 30, *323 1958, as well as the 5 cents per ton paid prior to that time. The only income the trusts were entitled to receive and that the income beneficiaries of the trusts were entitled to receive was possibly cash dividends paid as such by the Railroad on its stock. The above conclusion also finds support in section 167(a), I.R.C. 1939, and section 677(a), I.R.C. 1954, which provide generally that the grantor shall be treated as the owner of any portion of a trust whose income, without the approval or consent of any adverse party, may be distributed to the grantor. Sec. 1.677(a)-1, Income Tax Regs., interprets section 677(a) to mean that a grantor is treated as the owner of a portion of a trust whose income is or may be applied in discharge of a legal obligation of the grantor. Thus, even if the trust in this case was the owner of the stock, the payments which were to be credited to Ralph's obligation for purchase of the stock under the terms of the documents themselves would be taxable to Ralph. See also Ralph Conant, 7 T.C. 453, and cases cited therein. By instrument dated October 5, 1951, Ralph ostensibly sold the 1,000 shares of Railroad stock to Dorothea. While the purpose of this transfer *324 was admittedly to attempt to place this stock further beyond the reach of Ralph's creditors, there is also considerable doubt as to just what was intended to be transferred. Ralph had already transferred the stock to the trust and both parties speak of it as a transfer of Ralph's interest in the trust. In any event the terms of the document itself clearly made the transfer subject to the assignment of the stock as collateral security for Ralph's obligation on the note. And as heretofore noted, in all subsequent transactions Ralph acted and was treated as the owner of the stock. 314 By a series of documents executed October 22, 1951, Dorothea transferred to various individuals, all related to Ralph's attorney, percentage interests "in all distributions of property or cash made by the Pennsylvania Company for Banking and Trusts, trustee under a deed of trust executed by Ralph R. Lewis" dated October 5, 1951. It was made clear in the assignment documents that the transferees took no interest in the trust itself, or in the management or control of the trust, or in the stock of Railroad. The interests assigned totaled 49 percent, and this is presumably the reason respondent's original notice *325 of deficiency attributed only 51 percent of the 5-cent portion of the payments to the Lewises. It is amply clear from all the evidence, however, that the only rights transferred by these assignments was a percentage of property and cash distributed by the trust. It is equally clear that the trust had no right to distribute any part of the payments made by Railroad to the Jenkins family, nor could it distribute the Railroad stock to anyone other than the Jenkins family until Ralph's obligation was paid in full. Hence, we conclude that respondent has carried his burden of proving that the entire amount of the 5-cent factor was taxable to the Lewises. The final issue requiring decision is the effect of the agreements executed on April 30, 1958. The Lewises argue that those agreements represented a novation whereby the parties agreed to extinguish all obligations under the prior arrangement and to make a new arrangement. Respondent contends that the agreements of April 30, 1958, merely continued the prior obligations in a different form or, in the alternative, represented an assumption by Railroad of the balance of Ralph's indebtedness to the Jenkins family. We conclude that whether the *326 agreements of April 30, 1958, qualified technically as a novation, or as a modification of the prior agreements, or as something else, what they accomplished was nothing more or less than a continuation of the arrangement whereby earnings of Railroad were paid to the Jenkins family in satisfaction of the purchase price Ralph had agreed to pay them for their stock. There are several reasons for this conclusion. In the first place, Harvey, an associate of the Jenkins family, testified in detail as to the computation of what he advised Jenkins, Sr., would be a fair rental for the extended term of the locomotive lease. A principal element of that computation was the unpaid balance on Ralph's collateral note. In the second place, we find nothing in the record showing that Ralph's position was changed substantially by the agreements of April 30, 1958. The stock itself was to be held as collateral by First Pennsylvania. The only documents canceled were the locomotive lease of September 24, 1951, and Ralph's collateral note. Ralph was apparently relieved of the obligation to pay annual installments on the note, but the right of the Jenkins family to receive $500,000 for their stock as provided *327 in the general agreement of September 24, 1951, does not appear to have been relinquished even formally. Our conclusion that there was no substantial change in the rights and obligations of the parties is based primarily, however, on the fact that the parties agreed that claims arising out of Ralph's purchase of the Railroad stock would be settled only when there had been full compliance with the agreements of April 30, 1958, including payment of the rental under the lease, which was extended to 1973, and Railroad's purchase of the locomotives, which was to occur in 1973. Prior to that time Ralph was not relieved of his obligation to the Jenkins family for purchase of the stock. Respondent determined primarily that the $3,750 monthly rental provided for in the April 30, 1958, agreements would result in payments to the Jenkins family over the term of the agreements totaling $675,000. Respondent also determined that the balance due on Ralph's note on April 30, 1958, was $277,308.19, which was substantially supported by the Jenkins family's records. The $277,308.19 is approximately 41 percent of $675,000 so respondent determined that 41 percent of each payment made to the Jenkins family *328 under the 1958 agreements was attributable to Ralph's remaining obligation on the note and was taxable to Ralph as constructive dividends. We sustain respondent's determination that 41 percent of the rental paid to the Jenkins family by Railroad during the last 8 months of 1958 represented dividend income to the Lewises. [13] 315 Our conclusion above with respect to the true nature of the 1958 agreements makes unnecessary our consideration of respondent's alternative determination in docket No. 3537-65. As indicated *329 in our findings the parties have given some indication that they believe the amounts attributable to the Lewises as dividend income for 1958 should be reduced by an adjustment in the amount of $22,000. Due to the fact that the parties have not been entirely consistent in this regard, we will defer this issue for disposition on the Rule 50 computation. In view of the foregoing, the complexities of these cases, and to permit consideration of any concessions made by the parties during the course of the trial the effects of which may not be readily apparent, Decisions will be entered under Rule 50. Footnotes
1. Cases of the following petitioners are consolidated herewith: West Virginia Northern Railroad Company, docket No. 158-63; and Ralph R. and Dorothea G. Lewis, docket No. 3537-65.↩
2. Our use of the term "locomotive rentals" hereinafter is a matter of convenience and should not be construed to imply that all of the amounts in question were actually rental payments.↩
3. This separate installment payment appears to have related to the $20,000 which the Jenkins family loaned Ralph to use in canceling the arrangements with his bankers.
4. Although the record is not conclusive, the evidence which is available does indicate that both the name, the Pennsylvania Company for Banking and Trusts, which appears in documents in the record dated on or before April 8, 1952, and the name, First PennsylvaniaBanking and Trust Company, which appears in such documents dated April 30, 1958, refer to the same company. Since this point is not disputed by the parties, this company is referred to herein by the term, First Pennsylvania, regardless of the title actually appearing on the document in question.
5. The indicated agreement was the general agreement of September 24, 1951, described above.↩
6. While this instrument purports to sell the 1,000 shares of stock to Dorothea, Ralph had previously assigned the stock to the trustee. Subsequent documents and actions of the parties as hereinafter set forth, indicate that what Ralph actually intended to convey to Dorothea was his interest in the trust to which he had assigned the stock. The parties recognize this by stipulation (par. 20).↩
7. The interest of H. Russell Bishop was transferred on December 1, 1952, to William S. Sherman and his wife, Camille Sherman. The interest was placed in Camille's sole name and she has since continued to be a holder of a 2-percent interest.
1. The total amount of "locomotive rental" paid by Railroad during 1951 was $71,395.72, including $21,437.72 paid for the period prior to June 14, 1951, under the 7 1/2-cent rate of the original lease dated June 14, 1946. 2. This figure includes an adjustment of $9,000 which was stipulated by the parties and is explained in the text below. ↩
3. The amounts shown for 1958 relate only to the period through April 30, 1958. Although the parties have not been entirely consistent in their several stipulations with respect to the payments during this period, there were some pertinent reservations in the stipulations and the parties did tacitly agree on brief that the amounts shown above were the amounts to be used unless a reduction applicable to the entire year 1958 in the amount of $22,000 is to reflect the settlement described below whereby Railroad paid only $29,000 with respect to $51,000 which had been previously accrued but withheld from the Jenkins family.↩
8. As stated in fn. 1 to the table of locomotive rentals this amount was the total rental paid by Railroad under both the old and new leases in 1951, including the 5-cents-per-ton additional paid under the new lease.
1. The amount set forth in the statutory notice with respect to 1958 was $12,101.10. ↩
2. Respondent contends on brief that the total additional dividend income for 1956 was $51,178. The parties have stipulated that the amount attributable to the 5-cent portion of the rental for 1956 was $51,178.↩
9. This amount was shown to include the $12,101.10 with respect to which the deflciency had already been assessed and the additional $11,626.55 determined in the statutory notice.↩
10. The amount disallowed in that notice for 1958, which is not before us, was $23,677.40. The disallowed amount for 1958 was shown to be composed of three elements: (1) $7,377.40 attributable to the 5-cent portion of the rental for January and February; (2) $4,000 computed as 40 percent of a negotiated settlement of $10,000 for March and April; and (3) $12,300 computed as 41 percent of the total rental of $30,000 paid during the last 8 months of 1958.↩
11. Ralph and Dorothea filed joint returns for each of the years involved.↩
12. These arguments are obviously advanced to avoid collateral estoppel of a claim that the 5-cent portion of the payments was deductible as rent. The payments were deducted on Railroad's tax returns as rentals.
13. See report of Court of Claims Commissioner White, dated June 2, 1967, in West virginia Northern Railroad Co. v. United States, No. 277-63, which is reported in 1967 P-H par. 58,042, in which he concludes that 41 percent of the monthly payments made by Railroad to the Jenkins family under the agreements of April 30, 1958, were in reality sums paid by Railroad on Ralph's obligation to the Jenkins family and was not deductible or excludable by Railroad for the year 1958 on any of the theories advanced by petitioners herein. Since this opinion was written the Court of Claims approved and adopted the report of Commissioner White, see opinion 21 A.F.T.R. 2d 913↩; (Mar. 15, 1968).